171 N.J. Super. 375 (1979)
409 A.2d 300
RAILROAD ROOFING & BUILDING SUPPLY CO., INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
FINANCIAL FIRE & CASUALTY CO., A FLORIDA CORPORATION; GEORGE J. WOLFE, INC., A NEW JERSEY CORPORATION; MOFFATT EXCESS, INC., DEFENDANTS, AND NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, STATE OF NEW JERSEY, DEPARTMENT OF INSURANCE, DEFENDANTS-RESPONDENTS. THE WHITE MOTOR CREDIT CORPORATION, PLAINTIFF,
v.
BAR-DOW CORPORATION, INDIVIDUALLY AND IN THE NAME OF RICHARD SCHAUB, COMMISSIONER OF BANKING, JAMES F. DOWLING, INDIVIDUALLY AND IN THE NAME OF RICHARD SCHAUB, COMMISSIONER OF BANKING AND CHARLES A. BARBOSA, DEFENDANTS, AND JAMES F. DOWLING, INDIVIDUALLY AND TO THE EXTENT OF HIS INTEREST, IF ANY, IN BAR-DOW CORP., DEFENDANT-THIRD-PARTY PLAINTIFF-APPELLANT,
v.
THE ALL STATE-WIDE AGENCY, A CORPORATION, AND MURRAY DERMER, INDIVIDUALLY AND AS EMPLOYEE AND/OR AGENT OF ALL STATEWIDE AGENCY, T.M. BOYD, INDIVIDUALLY AND AS EXECUTIVE SECRETARY OF THE NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, THIRD-PARTY DEFENDANTS, AND JAMES J. SHEERAN, INDIVIDUALLY AND AS COMMISSIONER OF THE DEPARTMENT OF INSURANCE, THIRD-PARTY DEFENDANTS-RESPONDENT. ERNEST J. BUCCINI ET AL., PLAINTIFFS-INTERVENORS, APPELLANTS,
v.
STATE OF NEW JERSEY AND NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1979.
Decided December 17, 1979.
*378 Before Judges CRANE, MILMED and KING.
Allan Maitlin argued the cause for appellant Railroad Roofing & Building Supply Co., Inc. (Feuerstein, Sachs & Maitlin, attorneys).
Theodore A. Gardner argued the cause for appellant James F. Dowling (Timothy K. Madden, Director, Hudson County Legal Services Corp., attorney).
John I. Lisowski argued the cause for appellants Ernest J. Buccini et al. (Morgan, Melhuish, Monaghan & Spielvogel, attorneys).
Richard R. Spencer, Jr., argued the cause for respondent New Jersey Property-Liability Insurance Guaranty Ass'n (Stryker, Tams & Dill, attorneys; Richard R. Spencer, Jr., and Elizabeth A. Westcott on the brief).
Mark S. Rattner, Deputy Attorney General, argued the cause for respondents State of New Jersey, Department of Insurance, and James J. Sheeran, Commissioner of Insurance (John J. Degnan, Attorney General of New Jersey, attorney; Stephen Skillman, Assistant Attorney General, of counsel, and David M. Hawkins, Deputy Attorney General, on the briefs).
*379 The opinion of the court was delivered by KING, J.A.D.
These three cases involve the common question of whether claims against surplus lines insurance carriers, declared eligible to issue policies in this State by the Commissioner of Insurance and which become insolvent, fall within the protective scope of the New Jersey Property-Liability Insurance Guaranty Association Act (Guaranty Act), N.J.S.A. 17:30A-1 et seq. In summary proceedings, the judges of the Law Division held they did not.
The three types of claims which were left uncovered because of the insolvencies of the eligible surplus lines carriers were: (1) a theft insurance claim for a heavy-duty truck, underwritten by Financial Fire and Casualty Company; (2) a fire insurance claim on business premises, underwritten by the same company, and (3) medical malpractice claims, underwritten by All-Star Insurance Corporation. Appellants contend that these claims should be covered by the Guaranty Act.
The Guaranty Act was adopted in New Jersey in 1974 as a mechanism to protect this State's policyholders and claimants from the devastating financial effects consequent upon an insurer's insolvency. N.J.S.A. 17:30A-2(a). Due to the imminently impending insolvency of the Professional Insurance Company of New York, there were no legislative hearings held prior to enactment. All parties concede that there is no formal legislative history available. The Guaranty Act was derived in large measure from the Model Guaranty Association Post-Assessment Bill promulgated by the National Association of Insurance Commissioners in 1969. Since then the model bill has been adopted in varying forms in about 47 states. The legislative purpose in our version of the Guaranty Act was stated explicitly:
The purpose of this act is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the insolvency of an *380 insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers. [N.J.S.A. 17:30A-2(a)]
The Guaranty Act was declared to apply "to all kinds of direct insurance" except life, accident and health, workers' compensation, title, annuities, surety bonds and insurance provided by the Motor Vehicle Liability Security Fund (N.J.S.A. 39:6-92 et seq.). N.J.S.A. 17:30A-2(b). Respondent Guaranty Association appropriately concedes that direct insurance for vehicle theft, building fire and medical malpractice claims are not among the expressly excluded categories of coverages under the Guaranty Act.
Respondent Guaranty Association contends, however, that all surplus lines coverages and claims emanating therefrom, though direct insurance within the meaning of the Guaranty Act, and not excess or reinsurance coverages, are beyond the ambit of the act. The Guaranty Association contends that eligible surplus lines carriers are neither "admitted [n]or authorized to transact the business of insurance in this State" and thus are not within the definition of "insolvent insurer" contained in N.J.S.A. 17:30A-5(e)(1) of the Guaranty Act. Under the act, the Association is liable only for covered claims against an "insolvent insurer," as defined therein. N.J.S.A. 17:30A-8(a)(1) and (2). The word "admitted" was added to the model bill by our New Jersey act. The basic question is whether the term "admitted" should be interpreted to include surplus lines carriers declared by the Commissioner of Insurance as eligible to sell policies in New Jersey.
Any examination of the scope of relief to be afforded under the Guaranty Act to insureds and claimants in this State must first acknowledge the express constructional admonition of the Legislature that "[t]his act shall be liberally construed to effect the purpose under section 2 [N.J.S.A. 17:30A-2, above], which shall constitute an aid and guide to interpretation." N.J.S.A. 17:30A-4(a). This court has previously stated that this *381 constructional mandate from the Legislature means that "the act must be interpreted to protect policyholders and claimants and to advance their interests rather than the interests of the Association." N.J. Prop.-Liab. Ins. Guar. Ass'n v. Sheeran, 137 N.J. Super. 345, 351 (App.Div. 1975), certif. den. 70 N.J. 143 (1976).
When construing similar legislation the Supreme Court of Mississippi stated:
It is clear that the Mississippi Insurance Guaranty Association Act was enacted for the express purpose of protecting the public against financial loss to policyholders or claimants because of the insolvency of insurers. In order to achieve this purpose, the association was created as an instrument whereby economic loss which would otherwise result will be shared by policyholders in companies that remain sound. To achieve this desirable result in which the public interest in involved, the legislature expressly provided that the statute is to be liberally construed. [Mississippi Ins. Guar. Ass'n v. Gandy, Miss., 289 So.2d 677, 681 (1974)]
In deciding whether claims which arose prior to the effective date of a guaranty act were covered, the Louisiana Court of Appeals used the following constructional principle:
The statute in question was enacted for the express purpose of protecting the public against financial loss to claimants or policyholders because of insolvency on the part of insurers. To achieve this desirable purpose, the Association was created as an instrument whereby the economic loss, which would otherwise result, would be shared by the holders of policies in companies which remain sound, and against whom the members of the Association may assess its cost of operation. Obviously the public interest is considerable. To achieve this most desirable result, the statute itself commands that it shall be liberally construed. [Louisiana Ins. Guar. Ass'n v. Guglielmo, La. App., 276 So.2d 720, 724 (1973)]
See, also, Zinke-Smith, Inc. v. Florida Ins. Guar. Ass'n, Inc., 304 So.2d 507 (Fla.App.Ct. 1974).
Surplus lines carriers write the 2% of the property-casualty insurance in this State which is not accepted by the standard domestic and foreign carriers authorized to do business in New *382 Jersey. This undesirable, high-risk 2% must be "exported," in the language of the surplus lines law, to the less-conventional market. (N.J.S.A. 17:22-6.41(c): to "export" means to place in an unauthorized insurer under the surplus lines law....). The Guaranty Association vigorously contended, and the judges who decided the motions agreed, that the Legislature intended to exclude claims against insolvent surplus lines insurers "because they are essentially unregulated entities whose underwriting practices and operating procedures have historically held forth the prospect of financial instability." The Association contended that surplus lines carriers were "characterized by various features which give them a distinct status within the industry and sets them apart as a separate class of insurers." In sum, a virtual outlaw status was ascribed to the surplus lines carriers.
The fact remains, however, the the Guaranty Act does not expressly exclude surplus lines insurance. In the guaranty acts of the States of Florida[1], Louisiana[2] and Rhode Island[3], for instance, the legislative intent is manifest by express exclusion. To prevail, the Association must make a persuasive case of inferential exclusion sufficient to overcome the legislative mandate of liberal construction in favor of including "all kinds of direct insurance." N.J.S.A. 17:30A-2(b).
The Law Division concluded that surplus lines insurance, although not specifically excluded from the Guaranty Act, was not within the act because surplus lines insurers were not "admitted or authorized to transact the business of insurance in *383 this State" within the definitional subsection, N.J.S.A. 17:30A-5(e), of the Guaranty Act. The terms "admitted or authorized" are nowhere defined in the act. In the proceedings below the terms "admitted or authorized" were interpreted in conformity with an alleged conventional understanding in the insurance industry that only those domestic and foreign insurers who held certificates of authority to transact business in this State, and thereby subjected themselves to the close scrutiny of the Commissioner of Insurance, were encompassed therein. N.J.S.A. 17:17-1; N.J.S.A. 17:32-1; N.J.S.A. 17:32-4.
The surplus lines law provides a mechanism for obtaining insurance for New Jersey residents which "cannot be procured from authorized" domestic and foreign insurers after "diligent effort." N.J.S.A. 17:22-6.42; N.J.S.A. 17:22-6.43(a). See Howell v. Rosecliff Realty Co., Inc., 52 N.J. 313, 316-317 (1968). The law was adopted in 1960 to rectify past abuses by some surplus lines brokers and carriers and to afford a measure of protection for New Jersey residents. L. 1960, c. 32. Certain conditions must be met before the Commissioner of Insurance may declare a surplus lines carrier eligible to write policies in this State. N.J.S.A. 17:22-6.42(b). The premium rate charged by the surplus lines carrier may not be lower than the lowest rate charged by an authorized insurer. N.J.S.A. 17:22-6.43(b). The contract form must be the standard form in actual current use by the majority of authorized insurers writing similar policies on similar risks in this State. N.J.S.A. 17:22-6.43(c). No unauthorized insurer may become a surplus lines insurer eligible to write policies in New Jersey unless it has been authorized in the state or country of its domicile for one year; furnishes a current annual financial statement; has a specified surplus; if alien, has a specified trust fund in the United States or a deposit with the Commissioner; demonstrates that its condition or methods of operation would not be hazardous to the public of this State; demonstrates good reputation for service and loss payment; demonstrates competent and trustworthy management, *384 and meets other statutory criteria. N.J.S.A. 17:22-6.45. The statute also provides for placement of insurance with ineligible unauthorized surplus lines carriers, but only if other markets are absolutely unavailable. Ibid.
The Commissioner may declare a surplus lines carrier ineligible to sell in New Jersey if there is reason to believe insolvency, unsound financial condition or violation of statutory conditions of eligibility exists. N.J.S.A. 17:22-6.46. A record of any surplus lines policy sold must be forwarded to the Commissioner by the agent or broker. N.J.S.A. 17:22-6.47; N.J.S.A. 17:22-6.51. The precise requirements for issuing and delivering a policy by the surplus lines agent are specified by N.J.S.A. 17:22-6.50; N.J.S.A. 17:22-6.52.
The statute also closely regulates the licensing of special surplus lines agents who must be residents of New Jersey. N.J.S.A. 17:22-6.55. The excess lines carriers may only sell through these specially licensed agents. N.J.S.A. 17:22-6.42(c). Regulation of these agents is important because, by definition, surplus lines carriers are not directly supervised by the Commissioner and are not authorized to transact business in this State. The agents must be bonded, N.J.S.A. 17:22-6.56; keep careful records, N.J.S.A. 17:22-6.57; file quarterly reports, N.J.S.A. 17:22-6.58, and collect from the insured and remit to the Commissioner a 3% gross premium-receipt tax, N.J.S.A. 17:22-6.59. The producing agents may be disciplined by suspension, revocation or refusal to renew their licenses, for good cause, as in the case of any other insurance agent or broker. N.J.S.A. 17:22-6.61; N.J.S.A. 17:22-6.62.
One of the Association's arguments against including surplus lines carriers within the scope of the Guaranty Act is the supposed difficulty in collecting the assessments required by N.J.S.A. 17:30A-8(a)(3) from these carriers. If a carrier refused to pay the assessment, the Commissioner could declare it ineligible to write excess lines in this State pursuant to N.J.S.A. *385 17:22-6.46. If surplus lines agents refused to cooperate in the assessment collection process, they could be appropriately disciplined. Collection of the 3% premium receipts tax has been feasible over the 19-year history of the surplus lines law. The Association's faint heart about collecting the statutory assessments under N.J.S.A. 17:30A-8(a)(3) is not a sufficient reason to deny insureds and policyholders of this State the protection of the Guaranty Association Act when dealing with surplus lines carriers who have been declared eligible to write policies in this State by the Commissioner but who have thereafter become insolvent.[4]
In the absence of formal legislative history, in support of its contention, the Guaranty Association relied on a series of affidavits of persons involved in the legislative drafting and the subsequent administration of the Act, including (1) Kenneth Nails, an insurance company executive and a member of the committee which drafted the model bill; (2) David Green, an insurance executive and member of the board of the Guaranty Association; (3) W. Morgan Shumake, executive assistant to the Commissioner; (4) Herman W. Hassler, Assistant Commissioner of Insurance; (5) William B. Pugh, Jr., an insurance executive and chairman of the Pennsylvania Guaranty Association, and (6) Kathryn Fern, an administrative analyst in the Department of Insurance. Shumake, Hassler and Fern, employees of the Executive Branch, were involved in the drafting and informational process which led to the adoption of the Guaranty Act. Nails, Green and Pugh presented their understanding of the industry's negative attitude towards including surplus lines carriers within guaranty acts. Counsel for the appellants assert that the short answer to these affiants' contentions is that none of them voted for the act and that there is not extant contemporaneous legislative *386 history indicating that the legislators' intent conformed to their intent. Such extrinsic materials may be useful in construing ambiguous legislation, but they "must be carefully scrutinized and their weight and authenticity evaluated...." Data Access Systems, Inc. v. State, 63 N.J. 158, 167 (1973).
None of the affidavits discussed the polestar constructional mandate that the act be liberally construed so as to provide a mechanism for the payment of claims against insolvent direct insurers, thereby protecting New Jersey insureds and property owners against financial loss. N.J.S.A. 17:30A-2; N.J.S.A. 17:30A-3. The principal concern of the industry representatives seemed to be that surplus lines carriers should be excluded because they represent a higher risk of insolvency than authorized domestic and foreign carriers and inclusion would drive up assessments. This seems perhaps a better reason to urge their inclusion as more consistent with the avowed legislative intent to protect the public interest.
One recognized authority has observed cogently:
In recognition that there is no necessary correlation between what the draftsman of the text of a bill understands it to mean and what members of the enacting legislature understand, and that the intent of the legislature is the determining consideration as compared to the views of draftsmen, their views are not generally considered proper grounds on which to base the interpretation of an act, in this country any more than in England. However, if the draftsman's views were clearly and prominently communicated to the legislature when the bill was being considered for enactment, so as to give reason to believe that legislators' understanding of the bill would have been influenced by the draftsman's communicated views and so as to be visible to others who are concerned to understand the meaning of the act, there is reason to invoke an exception to the general rule and attach weight to the draftsman's views. [2A Sutherland, Statutory Construction (4 ed. 1973), § 48.12 at 215]
See, also, Flagg v. Johansen, 124 N.J.L. 456, 459-460 (Sup.Ct. 1940).
An example of the potential confusion generated by reliance on such materials is presented by one of the few contemporaneous *387 documents submitted to the trial judges, an "executive office inter-communication" from Donald P. Sharkey, then assistant counsel to the Governor, to Senator Feldman, the majority leader, and Senator Hughes, the committee chairman. The memorandum states: "the use of the word `admitted' would therefore exclude `non admitted' surplus lines carriers who are only required to file their rates in New Jersey. Such firms include Lloyds of London and similar unusual risk carriers." As we have seen, eligible surplus lines carriers must do considerably more than merely "file their rates in New Jersey" and must transact their business only through carefully regulated agents. The risks involved here  vehicle theft, building fire, and medical malpractice  are hardly "unusual risks." For certain underwriting reasons they were perhaps undesirable, but surely not unusual. We cannot conclude from the extrinsic data that the intent of the draftsmen was "clearly and prominently communicated to the legislature" in an effective fashion when the bill was being considered, so that their intent was one with the legislature's intent.
The affidavits do serve to justify the administration of the Guaranty Act to date. The eligible surplus lines carriers have not been assessed by the Association. Claims against insolvent eligible surplus lines carriers have been denied by the Association. However, an administrative practice is not conclusive of the court's duty of statutory construction. It may be a helpful tool, perhaps sometimes persuasive, but never controlling. The task of statutory construction is, in the end, a judicial one. See New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575 (1978).
We conclude that in the cases before us the legislative mandate of liberal construction towards effecting the avowed purpose of the Guaranty Act in N.J.S.A. 17:30A-2, that it "shall apply to all kinds of direct insurance" except the enumerated exclusions, was erroneously rejected in the Law Division. The *388 definition of the word "admitted" which was accepted there was too rigid, formal and unrelated to the purposes of this remedial legislation.[5] In reality, eligible surplus lines carriers have been admitted into New Jersey's domestic insurance market. We conclude that the Legislature most probably intended that the public should be protected against the impact of insolvencies on the 2% of the market which they insure. We are not persuaded by the Association's argument for inferential exclusion.
In view of our construction of the Guaranty Act it is unnecessary to reach appellants' contention that the act is under-inclusive and therefore constitutionally defective.
The remaining issue for review is whether the Commissioner of Insurance and the State of New Jersey are immunized from liability by the Tort Claims Act, N.J.S.A. 59:2-5 and N.J.S.A. 59:3-6, against a claim that the Commissioner negligently failed to declare an eligible surplus lines carrier ineligible pursuant to N.J.S.A. 17:22-6.46, which states in pertinent part:
If at any time the commissioner has reason to believe that any unauthorized insurer then on the list of eligible surplus lines insurers is insolvent, or in unsound financial condition, or that it is no longer eligible under the conditions therefor provided in section 11 of this act, he shall withdraw the eligibility of the insurer to insure surplus lines risks in this State.
Appellants Dowling and Buccini contend that the Commissioner and his aides were remiss in not withdrawing the surplus lines carriers' eligibility when they knew or should have known that they were in unsound financial condition. Appellants contend that they detrimentally relied on the Commissioner's listing of eligibility in purchasing their coverage. It was held in the *389 Law Division that N.J.S.A. 59:2-5 conferred immunity upon the State. This section states:
A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked.
It was also held in the Law Division that the parallel section, N.J.S.A. 59:3-6, conferred personal immunity on the Commissioner. We agree. Malloy v. State, 76 N.J. 515 (1978), controls. In that case plaintiff had passed the examination to become a real estate salesman. Due to a clerical error the Real Estate Commission notified plaintiff that he had failed. Finally, about 15 months later plaintiff was notified that he had passed. Justice Sullivan, speaking for a unanimous court which rejected plaintiff's claim for damages, stated:
We are satisfied that the immunity granted is pervasive and applies to all phases of licensing function, whether the governmental acts be classified as discretionary or ministerial. We understand the requirement that the public entity be "authorized by law to determine" whether a license, etc. be issued, denied, suspended or revoked to serve only to identify the public entity to whom the immunity extends and not to limit such immunity to the decision-making process. [Id. at 520]
We conclude that the Commissioner's statutory power to declare the eligibility or ineligibility of surplus lines carriers falls clearly within the words "approval, ... or similar authorization" in N.J.S.A. 59:2-5 and N.J.S.A. 59:3-6, and that the Commissioner is immunized from liability when exercising that power, given the principle that the immunity is pervasive as to discretionary acts performed in the course of the licensing function.
Reversed.
NOTES
[1] Fla. Stat.Annot. § 631.52 (West).
[2] La.Rev.Stat.Annot. § 22.1258 (West).
[3] R.I. Gen. Laws § 27-34-3. Surplus lines carriers were expressly included in the initial Rhode Island Guaranty Act, L. 1970, c. 166, § 1, but were later specifically excluded by a deleting amendment, L. 1976, c. 335, § 1.
[4] Under the statute the assessment may not exceed 2% of the member's net premiums per year. The actual rate varies from 1/2 of 1% to 2%, depending on the type of insurance.
[5] One appellate court has concluded that claims against insurers unauthorized to transact business in the State were not covered by a guaranty act. Osborne v. Edison, Iowa, 211 N.W.2d 696 (Sup.Ct. 1973). Iowa did not add the word "admitted" to the model act. The implications of extending coverage to claims against insolvent but eligible surplus lines carriers were not discussed.