725 A.2d 1093

AMERICAN EMPLOYERS' INSURANCE COMPANY AND COMMERCIAL UNION INSURANCE COMPANY (AS SUCCESSOR TO CERTAIN OBLIGATIONS OF EMPLOYERS' SURPLUS LINE INSURANCE COMPANY AND EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LTD.), PLAINTIFFS–RESPONDENTS, v. ELF ATOCHEM NORTH AMERICA, INC., DEFENDANT–RESPONDENT, AND PENNWALT CORPORATION AND ITS SUCCESSORS AND ASSIGNS, A.C.E. INSURANCE COMPANY (BERMUDA) LTD., THE AETNA CASUALTY AND SURETY COMPANY, ALLIANZ UNDERWRITERS INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY, FORMERLY NORTHBROOK INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN RE-INSURANCE COMPANY, ATLANTA INTERNATIONAL INSURANCE COMPANY, BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, CALIFORNIA UNION INSURANCE COMPANY, CENTENNIAL INSURANCE COMPANY, THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, CHI-

CAGO INSURANCE COMPANY, CITIZENS CASUALTY COMPANY OF NEW YORK, CONTINENTAL CASUALTY COMPANY, THE CONTINENTAL INSURANCE COMPANY, EMPLOYERS INSURANCE OF WAUSAU, A MUTUAL COMPANY, FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GIBRALTAR CASUALTY COMPANY, GRANITE STATE INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, THE HANOVER INSURANCE COMPANY, THE HOME INSURANCE COMPANY, ILLINOIS INSURANCE EXCHANGE, INSURANCE COMPANY OF NORTH AMERICA, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, INTERNATIONAL INSURANCE COMPANY, INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, LONDON MARKET INSURANCE COMPANIES, LEXINGTON INSURANCE COMPANY, MUTUAL MARINE INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, NEW ENGLAND INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, NORTH STAR REINSURANCE CORPORATION, OIL CASUALTY INSURANCE, LTD., OLD REPUBLIC INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, PENNSYLVANIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, PURITAN EXCESS AND SURPLUS LINES INSURANCE COMPANY, ROYAL INDEMNITY COMPANY, SAFETY NATIONAL CASUALTY CORPORATION, ST. PAUL FIRE AND MARINE INSURANCE CO., ST. PAUL SURPLUS LINES INSURANCE CO., TALEGEN HOLDINGS INC. (FORMERLY CRUM AND FORSTER, INC.), THE TRAVELERS INDEMNITY COMPANY, UNAT (A MEMBER OF AMERICAN INTERNATIONAL GROUP), WINTERTHUR SWISS GROUP, X.L. INSURANCE COMPANY, LTD. (NBA EXCESS AND SURPLUS LINES BERMUDA, LTD.) THE YASUDA FIRE & MARINE INSURANCE COMPANY OF AMERICA, ZURICH INSURANCE COMPANY, AND JOHN DOES ONE THROUGH TWO HUNDRED, DEFENDANTS,THE NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, DEFENDANT–APPELLANT.

ELF ATOCHEM NORTH AMERICA, INC. AND PENNWALT CORPORATION, THIRD–PARTY PLAINTIFFS, v. AIU INSURANCE COMPANY; AMERICAN RE–INSURANCE COMPANY; BIRMINGHAM FIRE INSURANCE COMPANY OF PA; CALIFORNIA UNION INSURANCE COMPANY (SUCCEEDED BY CIGNA SPECIALTY INSURANCE CO.); CENTENNIAL INSURANCE

COMPANY; CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA; CHICAGO INSURANCE COMPANY; THE CONTINENTAL CORPORATION (AS SUCCESSOR–IN–INTEREST TO HARBOR INSURANCE COMPANY); CONTINENTAL CASUALTY CO.; FEDERAL INSURANCE COMPANY; GIBRALTAR CASUALTY COMPANY; GREAT AMERICAN INSURANCE COMPANY; THE HANOVER INSURANCE COMPANY; THE HOME INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA; INTERNATIONAL INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; NEW ENGLAND INSURANCE COMPANY; NORTH BROOK INSURANCE COMPANY (SUCCEEDED BY ALLSTATE INSURANCE COMPANY); OLD REPUBLIC INSURANCE COMPANY; PACIFIC EMPLOYERS INSURANCE COMPANY; PURITAN EXCESS AND SURPLUS LINES INSURANCE COMPANY (AS SUCCESSOR–IN–INTEREST TO PURITAN INSURANCE COMPANY, FORMERLY THE MANHATTAN FIRE AND MARINE INSURANCE COMPANY); ROYAL INDEMNITY COMPANY; SAFETY NATIONAL CASUALTY CORPORATION (FORMERLY KNOWN AS SAFETY MUTUAL CASUALTY CORPORATION OF AMERICA); ST. PAUL FIRE AND MARINE INSURANCE COMPANY; ST. PAUL SURPLUS LINES INSURANCE COMPANY; TALEGEN HOLDINGS, INC.; AND TEXAS PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, THIRD–PARTY DEFENDANTS.

Argued December 1, 1998—Decided March 17, 1999.

*Hugh P. Francis,* argued the cause for appellant (*Francis & O'Farrell,* attorneys; *Mr. Francis* and *Peter A. Olsen,* on the brief).

*James W. Christie, III,* argued the cause for respondents American Employers' Insurance Company and Commercial Union Insurance Company (*Christie, Pabarue, Mortensen and Young,* attorneys; *Marybeth Smith Werb,* on the brief).

*Paul E. Breene,* argued the cause for respondent Elf Atochem North America, Inc. (*Anderson Kill & Olick,* attorneys; *Mr. Breene* and *Ian R. Scheinmann,* on the briefs).

*Michael E. Goldman,* Deputy Attorney General, argued the cause for *amicus curiae* New Jersey Department of Banking and Insurance (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Mitchell A. Newmark,* Deputy Attorney General, on the brief).

*Richard R. Spencer, Jr.,* submitted a brief on behalf of *amicus curiae* National Conference of Insurance Guaranty Funds (*Bressler, Amery & Ross,* attorneys; *Mr. Spencer* and *Jennifer E. Birmingham,* on the brief).

The opinion of the Court was delivered by

OHERN, J.

"In the arena of environmental insurance law, it sometimes appears that just as soon as one issue of importance is resolved, like Hydra, the many-headed serpent in Greek mythology, at least two new issues arise to replace it." *General Accident Ins. Co. of America v. Department of Envtl. Protection,* 143 *N.J.* 462, 463–64, 672 *A.*2d 1154 (1996) (quoting Jeffrey L. Fillerup and Dominic S. Nesbitt, *The Duty to Defend: Post–Montrose Issues,* 718 *PLI/Comm.* 49 (PLI Commercial Law and Practice Course Handbook Series No. 4477, May–June 1995)). One such new issue that has arisen concerns the responsibility of a liability insurance guaranty association to stand in the shoes of an insolvent insurance company to provide indemnity for environmental cleanup costs incurred by the policyholder. The specific question is whether the New Jersey Property–Liability Insurance Guaranty Association (NJPLIGA) should indemnify a policyholder of an insolvent insurance carrier for environmental cleanup costs incurred at a facility of the policyholder in Bryan, Texas. The enabling legislation requires NJPLIGA to stand in the shoes of its insolvent member insurance companies only in proceedings involving "covered claims." *N.J.S.A.* 17:30A–8a(2). Covered claims include those in which "(1) the claimant or insured is a resident of this State at the time of the insured event; or (2) the property from which the

claim arises is permanently located in this State." *N.J.S.A.* 17:30A–5d.

Thus the determination of whether NJPLIGA is obliged to provide coverage for the policyholder's claims with respect to the Bryan, Texas facility rests on whether the policyholder was a resident of New Jersey at the time of the insured event. Based on our review of New Jersey law and consideration of the purposes and objectives of NJPLIGA, we conclude that the policyholder is not a resident of New Jersey for the purposes of the NJPLIGA Act and that the claim is not a "covered claim" under the statute.

I.

This appeal concerns a very small portion of a very large and complex environmental insurance coverage case. American Employers' Insurance Company and Commercial Union Insurance Company (referred to collectively as Commercial Union) filed an insurance declaratory judgment action against Elf Atochem North America, Inc., seeking to disclaim coverage for environmental damage claims relating to pollution at approximately eighty Elf Atochem sites throughout the United States, one of which is the Bryan, Texas site. Because Pennwalt Corporation is Elf Atochem's predecessor in this suit, defendant will be referred to as "Elf/Pennwalt." Elf/Pennwalt responded with counterclaims, cross-claims and a third-party complaint, one of which was against NJPLIGA. During the pendency of the New Jersey proceedings, Elf/Pennwalt filed a declaratory judgment action in Texas against Commercial Union seeking coverage for certain bodily injury claims arising from operations at the Bryan, Texas facility. The Law Division temporarily restrained Elf/Pennwalt from proceeding in Texas, but subsequently dissolved the restraints. On interlocutory appeal, the Appellate Division remanded the matter to the trial court for entry of an order enjoining Elf/Pennwalt from proceeding with the coverage action in Texas.

In response to a case management order that required the parties to proceed first with the Bryan, Texas coverage issues, NJPLIGA sought a partial summary judgment to dismiss the claims arising out of that site, asserting that these were not covered claims because Elf/Pennwalt is not a resident of New Jersey nor is the site located in New Jersey. The Law Division reasoned that *Eastern Seaboard Pile Driving Corp. v. New Jersey Property–Liability Insurance Guaranty Ass'n,* 175 *N.J.Super.* 589, 421 *A.*2d 597 (App.Div.1980), had not provided "a bright-line rule for determining residency for purposes of NJPLIGA. There has to be a balancing act."

In determining Elf/Pennwalt's residence, the trial court considered that Elf/Pennwalt had been qualified to do business in New Jersey and had conducted business in New Jersey for many years. The court denied NJPLIGA's motion for summary judgment to dismiss the Bryan, Texas claims, concluding that Elf/Pennwalt "is a resident of several states and in this case is clearly a resident of the State of New Jersey for the purposes of [NJPLIGA]."

The Appellate Division denied NJPLIGA's motion for leave to appeal. Because the matter involves issues of important public policy and the costs to NJPLIGA of defending the Bryan, Texas suit are substantial, we granted leave to appeal. 153 *N.J.* 405, 709 *A.*2d 798 (1998).

## II.

### A.

NJPLIGA was created in 1974 to protect against the possible insolvency of insurance companies doing business in New Jersey. The Act imposed assessments on casualty insurers registered and issuing policies in New Jersey in order to create a fund to pay claims against carriers that have become insolvent. *L.* 1974, *c.* 17; *N.J.S.A.* 17:30A–1 to –20; *see Railroad Roofing & Bldg. Supply Co., Inc., v. Financial Fire & Cas. Co.,* 85 *N.J.* 384, 389–90, 427 *A.*2d 66 (1981). Although NJPLIGA was created by statute, it is

not a governmental entity, but rather a nonprofit, unincorporated association whose members consist of insurance companies licensed to issue certain types of insurance policies in New Jersey. NJPLIGA assumes the contractual obligations of insolvent insurance companies that were licensed to transact business within this State at the time the policy was issued or when the insured event took place. *N.J.S.A.* 17:30A–5d and –8. As noted, *N.J.S.A.* 17:30A–5d limits covered claims to those in which "(1) the claimant or insured is a resident of this State at the time of the insured event; or (2) the property from which the claim arises is permanently located in this State."

The Post–Assessment Property and Liability Insurance Guaranty Model Act (Model Act), which nearly every state has adopted in some form, was originally prepared by the National Association of Insurance Commissioners (NAIC) as a means of allocating the risk of insolvent insurers equitably among the several states. "Resident" was not defined in the original Model Act. The NAIC later adopted an amendment to the Model Act to clarify the meaning of the term "resident." The Model Act now provides coverage when "the claimant or insured is a resident of this state at the time of the insured event, provided that for entities other than an individual, the residence of a claimant, insured or policyholder is the state in which its principal place of business is located at the time of the insured event." *NAIC Post–Assessment Property and Liability Insurance Guaranty Association Model Act, NAIC Model Laws, Regulations and Guidelines,* Vol. III, at 540–41 (1996). Thus, for those states that adopted the amendment, a corporation's residence is limited to the single state of its principal place of business.

In contrast, in states like New Jersey, in which the narrowing amendment has not been adopted, corporations may still be regarded as residents of several states. The main debate between the parties is whether the NJPLIGA Act should follow the definition of "resident" found in the amendment to the Model Act.

## B.

Each side claims to draw support from this amendment. Elf/Pennwalt claims that before the amendment the Model Act contained a latent ambiguity created by the insurance industry's undefined use of the term "resident" as it applied to corporations. Thus, Elf/Pennwalt argues that a corporation's residence should be limited to the single state of its principal place of business only in states that have adopted the amendment.

In contrast, NJPLIGA and the *amici* National Conference of Insurance Guaranty Funds argue that the amendment simply clarifies what was the ordinary and natural understanding of the original Model Act. They contend that in order to ensure uniform national interpretation of guaranty fund legislation, this Court should interpret the NJPLIGA Act to exclude insurance coverage for corporations whose principal place of business is in a jurisdiction other than New Jersey.

The NJPLIGA Act is patterned after but not identical to the Model Act. *See Railroad Roofing, supra,* 85 *N.J.* at 391–92, 427 *A.*2d 66 (noting differences in definitions). Thus an examination of the Model Act (and its later renditions) does not resolve whether a corporation is a "resident" for NJPLIGA purposes. We must look to our own Act.

## C.

Each side also relies on the same precedent. Elf/Pennwalt argues that *Eastern Seaboard, supra,* is controlling. NJPLIGA contends that *Eastern Seaboard* all but endorsed the principal place of business test to determine whether a corporation meets the residency requirement.

In *Eastern Seaboard,* the Appellate Division rejected the trial court's conclusion that the NJPLIGA Act contemplated that only a domestic corporation, that is, one incorporated under the laws of the State of New Jersey, could be a resident. *Eastern Seaboard, supra,* 175 *N.J.Super.* at 591, 421 *A.*2d 597. The court held that a

corporation that was incorporated under the laws of the State of Delaware could present a covered claim as a resident of New Jersey for the purposes of the NJPLIGA Act. *Id.* at 594–95, 421 *A.*2d 597. It found that based upon the intended legislative function of the NJPLIGA Act, the statutory language could not have contemplated that only domestic corporations of this State would be covered. *Id.* at 594, 421 *A.*2d 597. Rather, the Appellate Division found that the Legislature intentionally refrained from the use of any term that would limit benefits under the Act to domestic corporations. *Ibid.* Instead, the Legislature used the broader term "resident," which does not require the exclusion of all but domestic corporations. *Ibid.*

A review of *Eastern Seaboard* convinces us that it is not dispositive of this case. In *Eastern Seaboard,* a Delaware corporation maintaining its principal place of business in New Jersey sought indemnification from NJPLIGA after Eastern Seaboard discovered that its steel dredging barge had been damaged and that one of the carriers insuring the barge was insolvent. *Id.* at 590–91, 421 *A.*2d 597. The insurance company, Interstate Insurance Company, issued the policy in New York but the court presumed that the company was licensed to do business in New Jersey. *Id.* at 593, 421 *A.*2d 597. Eastern Seaboard maintained an executive office in New Jersey and had allocated all of its corporate assets to New Jersey for tax purposes. *Id.* at 594, 421 *A.*2d 597. Eastern Seaboard also "conduct[ed] substantially all of its business in New Jersey and has never maintained a place of business in Delaware," the state of Eastern Seaboard's incorporation. *Ibid.* In holding that Eastern Seaboard was a New Jersey resident for the purposes of the NJPLIGA Act, the court noted that "[w]hether a corporation has established a residence in a foreign jurisdiction depends upon the aim and context of the statute in which the residency requirement is contained and the extent and character of its business there transacted." *Id.* at 592, 421 *A.*2d 597 (citing 17 *Fletcher, Encyclopedia of Private Corporations,* § 8300 at 10 (1977); 36 *Am.Jur.*2d, *Foreign Corporations,* § 37 at 52 (1968)).

## III.

### A.

 "Residence" is a word with many meanings. For example, a person may have only one domicile, but a person may have more than one residence. Although a corporation is usually thought to be domiciled in its place of incorporation, depending on the context, it may be considered a resident of several states. The Federal Judicial Code provides that a corporation is considered a resident of any judicial district where it is incorporated, licensed to do business, or doing business. 28 *U.S.C.* § 1391(c); 36 *Am. Jur.*2d *Foreign Corporations* § 511 (1968). On the other hand, for purposes of diversity jurisdiction, a corporation may be considered a citizen only of a state by which it has been incorporated or of the state in which it has its principal place of business. 28 *U.S.C.* § 1332(c)(1). Thus, the trial court was correct in finding that a corporation may be a resident of more than one state for certain purposes.

It is a question of legislative intent whether a corporation that does no more than transact business in New Jersey should be considered a resident for purposes of protection under NJPLIGA for a claim arising elsewhere than in New Jersey concerning a site not located in New Jersey.[1] In determining that legislative intent, we consider the purposes of the NJPLIGA Act, *supra* at 586–87, 725 *A.*2d 1097. Although the scope of relief under the Act is to be construed liberally to effect its purposes, *Railroad Roofing & Bldg. Supply Co., Inc. v. Financial Fire & Cas. Co.*, 171 *N.J.Super.* 375, 380, 409 *A.*2d 300 (App.Div.1979), *rev'd on other grounds*, 85 *N.J.* 384, 427 *A.*2d 66 (1981), clearly one concern of the Legislature is "to conserve limited Association resources to better assure their availability to serve core purposes." *New Jersey*

---

[1] On occasion, the Legislature has stated that a corporation may only be a resident of the state in which its principal place of business is located, *e.g.*, *N.J.S.A.* 17B:32A–1 (defining "resident" for purposes of New Jersey Life and Health Guaranty Association Act), but we do not find that conclusive.

*Guar. Ass'n ex rel. v. Ciani*, 242 *N.J.Super.* 164, 169, 576 *A.*2d 300 (App.Div.1990).

■ Considering the "core purposes" of the Act, we conclude that a business entity should be considered a resident of New Jersey for the purposes of NJPLIGA when its principal place of business is within the State. We find analogous our recent decision in *Pfizer, Inc. v. Employers Ins. of Wausau*, 154 *N.J.* 187, 712 *A.*2d 634 (1998). In that case, in determining the appropriate choice-of-law to be applied to the interpretation of environmental insurance policies, we concluded that the answer depended on which state had the dominant public policy interest in having its law apply to determine the coverage issue. *Id.* at 208, 712 *A.*2d 634. In this context of determining residence for the purposes of coverage by an insurance guaranty association, the question is which state guaranty association has the dominant public policy interest in providing coverage for the claim. The guaranty acts themselves express certain priorities to ameliorate risk to claimants or policyholders because of the insolvency of insurers.[2] When the site of the risk is not located within a state, then the claimant's relationships with the state from which guaranty is sought should be considered. The principal place of the claimant's business is obviously the most important other factor to consider.

We acknowledge that this "bright-line rule" may not be as easy to apply as one might think. A corporation may have manufacturing facilities in several states, headquarters in yet another state, and significant retail and distribution centers scattered throughout all of the states in which it operates. Examples that come to mind

---

[2] Under the NJPLIGA priority provision, a claimant

> shall seek recovery first from the association of the place of residence of the insured at the time of the insured event except that if it is a first party claim for damage to property with a permanent location, he shall seek recovery first from the association of the location of the property.... [I]f recovery is denied or deferred by the association, a person may proceed to recover from any other insurance guaranty association or its equivalent from which recovery may be legally sought.
>
> [*N.J.S.A.* 17:30A–12.]

are those such as the American Telephone and Telegraph Company, which for many years had its headquarters in New York but conducted much of its business in New Jersey. Surely if such a company obtained insurance in New Jersey to cover operations here and its activities resulted in liability elsewhere (e.g., for transporting hazardous materials to Pennsylvania), it could still be considered eligible for coverage under NJPLIGA, subject to the Act's priority provisions.[3] Still, we believe that adoption of the principal place of business rule to determine residence for NJPLIGA purposes will simplify the process of decision and we hope that the rule will expedite the processing of claims fairly and efficiently.

Adoption of the principal place of business rule is generally consistent with the *Guiding Principles for Settling Disputes Between and Among Property and Casualty Insurance Guaranty Associations as to Responsibility for Claims*, 1 *N.A.I.C. Proc.* 457–59 (1986) ("Guiding Principles"). According to the Guiding Principles, which guaranty association shall have the primary responsibility of proceeding with the defense or settlement of a claim depends upon a weighing of relevant factors that "should be determined in each individual circumstance."[4] *Id.* at 458. The

---

[3] "Although there is no set standard or single test by which a court can determine where a corporation's principal place of business is located, the courts have developed three distinct tests for determining a corporation['s] principal place of business: (1) the nerve center test, which is used where a corporation is engaged in far-flung and varied activities which are carried on in different states; (2) the place-of-operations test, which is used where a corporation has its executive or administrative offices in one state and its physical operations wholly or predominantly in another state; and (3) the total activity test, a hybrid test which is used where neither the nerve center nor place of operations test is appropriate. Deciding which approach to apply and which indices to emphasize, therefore, depends to a great extent on the character of the corporation and the scope of its activities." 32A *Am.Jur.2d Federal Courts* § 802 (1995) (footnotes omitted).

[4] According to the draft of the Guiding Principles:

The residence of an insured entity which is not a natural person shall be determined by considering which state has the most significant contacts

first two factors (and presumably the most important) are the location of the entity's headquarters and the location of the operations at issue.

Thus although we agree with the trial court that the proper analysis involves an assessment of various factors, Elf/Pennwalt's business presence alone is insufficient to establish residency for the purpose of qualifying for coverage under NJPLIGA. The preponderance of the remaining factors clearly points to other jurisdictions as having the much more dominant and significant relationship to coverage for the risk. *See Douglass v. Levi Strauss & Co.*, 315 *Ark.* 380, 385, 868 *S.W.*2d 70, 73 (Ark.1993) (finding that corporation incorporated in Delaware with principal place of business in California is not resident in Arkansas despite substantial presence there).

Elf/Pennwalt's principal place of business is in Pennsylvania. All of the insurance policies upon which Elf/Pennwalt now seeks recovery were issued to its headquarters in Philadelphia, Pennsylvania. Elf/Pennwalt paid the premiums in Pennsylvania and also paid the surcharges on the policies to the Pennsylvania guaranty fund. Although the insurance companies were licensed to do business in New Jersey, the policies at issue were not issued in New Jersey, nor were they intended exclusively to cover risks in New Jersey. The insured risks, of course, involved operations in Bryan, Texas.

---

with the insured. In making this determination, the following criteria should be considered:

(i) state where executive offices or corporate headquarters are located;

(ii) location of the operation where the insured event occurred;

(iii) state of incorporation;

(iv) state where the applicable insurance policy was issued or delivered; and

(v) state that is considered the insured entity's primary domicile for state income tax purposes.

Other factors may be considered if it is agreed those factors are relevant to the inquiry.

[1 *N.A.I.C. Proc.* 458 (1986).]

Elf/Pennwalt emphasizes the essential unfairness of holding that it is not a resident. It is in litigation in New Jersey against its will. When it attempted to bring a coverage action in Texas, Elf/Pennwalt was enjoined from doing so by our courts. It argues that one held captive, as it were, in a state ought at least receive the benefits of that forum's law. Elf/Pennwalt's argument is appealing, but not dispositive. In retrospect, it may have been preferable if Elf/Pennwalt had been allowed to pursue its coverage claims under Texas law, including coverage under the Texas guaranty act. The New Jersey coverage proceedings will presumably be governed by Texas law insofar as the proceedings concern Texas sites. *See Pfizer, supra,* 154 *N.J.* at 203, 712 *A.*2d 634.

## B.

In addition, NJPLIGA suggests that a contrary holding would have the effect, not of increasing available insurance coverage, but rather of absolving the more significantly related guaranty associations of any burden. An overly broad definition of "resident" might place New Jersey at a disadvantage compared to other states. Holding that Elf/Pennwalt is a resident of New Jersey for purposes of NJPLIGA coverage may allow the Texas and Pennsylvania guaranty associations to escape responsibility altogether for Elf/Pennwalt's liability at the Bryan, Texas site, leaving NJPLIGA to satisfy these claims up to its statutory cap.[5]

The guaranty associations of Pennsylvania and Texas each have priority provisions substantially identical to *N.J.S.A.* 17:30A–12 that require a policyholder with a covered claim first to seek recovery from the guaranty association in its state of residence. As we have noted, Elf/Pennwalt is incorporated in Pennsylvania and also has its principal place of business in Pennsylvania. NJPLIGA argues that, under Pennsylvania law, a corporation may

---

[5] The NJPLIGA Act provides that the association's obligation "shall include only that amount of each covered claim which is less than $300,000.00 and subject to any applicable deductible contained in the policy...." *N.J.S.A.* 17:30A–8a(1).

have only one state of residence for purposes of its guaranty association. *T & N, plc, v. Pennsylvania Ins. Guar. Ass'n,* 44 *F.*3d 174, 181 (3d Cir.1994). If Elf/Pennwalt is found to be a resident of New Jersey, there may be no coverage in Pennsylvania.

Similarly, under Texas law, the Texas guaranty association is entitled to a credit for the amount of any recovery from the guaranty association of Elf/Pennwalt's state of residence. Tex. Ins.Code Ann. *Art.* 21.28–C § 12(b) (West 1998). If Elf/Pennwalt is determined to be a New Jersey resident for purposes of NJPLIGA coverage, and because the Texas association statutory cap of liability is equal to or less than that of NJPLIGA, the argument is that NJPLIGA will have to satisfy the Bryan, Texas claims up to its statutory limit while the Texas association will pay little or nothing.

We have not attempted to resolve these questions of Texas and Pennsylvania law. It suffices to observe that the net result of a decision that Elf/Pennwalt is a New Jersey resident under the NJPLIGA Act might be that New Jersey insurance premium payers will be paying to clean up sites in Texas for a corporation whose principal place of business is in Pennsylvania. We doubt that this result would reflect the Legislature's intent.[6]

New Jersey has a public policy interest in protecting New Jersey policyholders, the victims of pollution in New Jersey, and New Jersey's environment. *Pfizer, supra,* 154 *N.J.* at 207, 712 *A.*2d 634. New Jersey's public policy interests are minimally implicated when the issue involves indemnifying a policyholder of a state other than New Jersey for liabilities incurred in states other than New Jersey. *Ibid.*

---

[6] Our research of guaranty associations elsewhere indicates that thirty-six jurisdictions have adopted the "principal place of business" rule to establish residence of business entities and twenty-four jurisdictions have a "one state of residency" rule.

## IV.

The trial court was fully aware of these multi-state concerns but believed that a single determination of coverage involving the guaranty associations of the several states can fairly resolve the allocation issues arising when a policyholder has operations in more than one state. We were informed that the trial court has ruled that Pennsylvania's guaranty association must provide coverage on the Bryan, Texas claims. Whether such an all-encompassing disposition can be accomplished depends on an important issue that is not before us. That issue is whether a guaranty association of one state may be subject to the personal jurisdiction of another state.

To date, at least six jurisdictions have considered whether one state has jurisdiction over another state's guaranty association. "Texas Has No Jurisdiction Over Claims Against Nonresident Associations," 9 No. 3 *Mealey's Litig. Rep.: Ins. Insolvency* 3 (July 2, 1997). In June 1997, "[t]he Texas court held that while the Pennsylvania guaranty fund act places the association in the insolvent insurer's shoes, the association assumes only certain substantive obligations of the insurer." *Ibid.* (discussing *Texas Property and Cas. Ins. Guar. Ass'n v. Boy Scouts of Am.*, 947 *S.W.*2d 682 (Tex.Ct.App.), *reh'g overruled* (1997)). The Texas court ultimately found that it lacked personal jurisdiction because the Pennsylvania guaranty association did not have sufficient minimum contacts with Texas. *Ibid.*

"Florida and California courts [have] held that a nonresident guaranty association is not subject to the forum state's personal jurisdiction." *Ibid.* However, two other courts have determined that nonresident guaranty associations may be subject to personal jurisdiction, provided that there are minimum contacts, such as transacting business or refusing to settle a claim. *Ibid.; see Washington Ins. Guar. Ass'n v. Ramsey*, 922 *P.*2d 237 (Alaska 1996) (minimum contacts exist where nonresident guaranty association's refusal to settle negligence claim resulted in actionable claim against association); *Olivier v. Merritt Dredging Co. Inc.,*

979 *F.*2d 827 (11th Cir.1992), *cert. denied,* 507 *U.S.* 983, 113 *S.Ct.*
1577, 123 *L. Ed.*2d 145, and *cert. denied,* 508 *U.S.* 910, 113 *S.Ct.*
2342, 124 *L. Ed.*2d 252 (1993) (injured seaman's claims against
associations come within Alabama long-arm statute). A Louisiana
court has found a nonresident guaranty association to be subject
to personal jurisdiction solely because the guaranty association
had stepped into the shoes of an insolvent insurer. *Mealey's
Litig. Rep., supra; Guidry v. Cajun Rentals & Servs., Inc.,* 563
*So.*2d 1335 (La.Ct.App.1990).[7]

The question whether New Jersey courts have jurisdiction over
nonresident guaranty associations will undoubtedly require our
eventual consideration. *See* "Asbestos Litigation: Guaranty Asso-
ciations Seek Dismissal of New Jersey Suit," 1 No. 17 *Mealey's
Litig. Rep.: Ins. Supplement* 14 (Nov. 7, 1995) (discussing New
Jersey action in which nonresident guaranty associations asserted
lack of personal jurisdiction in motion to dismiss). The *amici*
National Conference of Insurance Guaranty Funds argue that the
insurance guaranty associations of the several states are intended
to form a national safety net. They contend that the residency
requirement "is part of a carefully crafted national approach
which, when construed and administered as intended, apportions
the cost of funding claims arising under an insurer insolvency in a
rational, cohesive, and equitable manner throughout the United
States." This safety net realistically cannot be achieved unless a
single state can assert jurisdiction over the insurance guaranty
associations of other states.

However, even were we to decide that the Texas and Pennsylva-
nia guaranty associations are subject to our jurisdiction in this
case, consideration of the purposes of NJPLIGA persuades us that
Elf/Pennwalt, a corporation with its principal place of business in
Pennsylvania, should not be considered a "resident" of the State of

---

[7] We note that *N.J.S.A.* 17:30A–8a(2) provides that NJPLIGA is "deemed the
insurer to the extent of its obligation on the covered claims and to such extent
shall have all rights, duties, and *obligations* of the insolvent insurer as if the
insurer had not become insolvent[.]" (emphasis added).

New Jersey for purposes of coverage under NJPLIGA for claims that arose in Texas.

## V.

This case illustrates again the concerns that we expressed in *Owens–Illinois, Inc. v. United Insurance Co.*, 138 *N.J.* 437, 480, 650 *A.*2d 974 (1994), that substantial sums of money are consumed in litigating environmental insurance coverage disputes rather than in the payment of claims. States created insurance guaranty associations (IGAs) in the late 1960s largely "to forestall the passage of S. 2236 (91st Congress, 1st Session . . . ), which would have formed the Federal Insurance Guaranty Corporation." J. Ernest Hartz, Jr., *State Insurance Guaranty Associations: The Time Has Come to Establish Uniform Ground Rules—Or Prepare for Federal Involvement in Insurance Insolvency*, 22–FALL Brief 20, American Bar Association (Fall 1992). The purpose of the IGAs was to provide a national safety net to resolve the problem of insurance company insolvencies.

The managers of IGAs have the same responsibility as business managers to resolve these issues among themselves as efficiently as possible. Yet, "under normal circumstances, few IGAs will voluntarily assume a leadership role. Each wants to pass the buck and, to a greater or lesser degree, each assumes an air of indignation when requested to step up and pay." *Id.* at 22. As the "balkanization process intensifies, . . . the safety net that protects not only the insured but often other solvent insurers may be jeopardized." *Id.* at 23.

Understandably desirous of finding a comprehensive, national solution to the overlapping liabilities of the IGAs, the trial court sought to fashion an equitable allocation. It remains to be determined whether individual state courts have the constitutional authority to bring the IGAs together in one forum. Ideally, the IGAs that have adopted the Guiding Principles will agree, as the Guiding Principles themselves provide, to arbitrate disputes

among themselves.[8] "However, should individual IGAs continue to argue that each is the creature of its own state legislature and therefore cannot participate in a uniform nationwide system, then the need for a federal insurance guaranty association would seem apparent." *Id.* at 22.

## VI.

We reverse the trial court's denial of NJPLIGA's motion for summary judgment as to the Bryan, Texas claims and we direct the entry of a judgment in its favor as to those claims. The parties may wish to seek relief from the order of the Appellate Division enjoining Elf/Pennwalt from proceeding with the coverage action in Texas.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.

---

[8] We are informed that ten IGAs are currently signatories to the Guiding Principles. A number of other states' IGAs have withdrawn from the agreement.