547 So.2d 849 (1989)
ALABAMA INSURANCE GUARANTY ASSOCIATION
v.
MAGIC CITY TRUCKING SERVICE, INC.
MAGIC CITY TRUCKING SERVICE, INC.
v.
ALABAMA INSURANCE GUARANTY ASSOCIATION.
Joe CORONA and Mary Corona
v.
ALABAMA INSURANCE GUARANTY ASSOCIATION.
87-1321, 87-1348 and 87-1388.
Supreme Court of Alabama.
May 26, 1989.
Rehearing Denied June 23, 1989.
Karon O. Bowdre and Richard E. Smith of Rives & Peterson, Birmingham, for appellant/cross-appellee.
Kearney Dee Hutsler III and William J. Baxley, Birmingham, for appellants Joe Corona and Mary Corona.
*850 Rodney A. Max and W. James Ellison of Najjar, Denaburg, Meyerson, Zarzaur, Max, Wright & Schwartz, Birmingham, for appellee/cross-appellant.
SHORES, Justice.
These appeals present a coverage question under the Alabama Insurance Guaranty Association Act (Code 1975, § 27-42-1 et seq.). They involve a dispute concerning the obligations owed by the Alabama Insurance Guaranty Association to Magic City Trucking Company ("Magic City"). Magic City has two claims against the Guaranty Association due to the insolvency of both its primary and its excess liability policy carriers.
Joe and Mary Corona sued Magic City in the Circuit Court of Jefferson County in January 1983 for personal injuries suffered in an accident with one of Magic City's trucks on September 7, 1982. At that time, Magic City had primary liability coverage with Commercial Standard Insurance Company ("Commercial Standard") and excess coverage with Integrity Insurance Company ("Integrity"). Intitially, Commercial Standard undertook the defense of this suit, but both Commercial Standard and Integrity were adjudicated insolvent in 1985. Magic City then presented this claim to the Guaranty Association, which assumed the defense of the lawsuit brought by the Coronas.
Commercial Union Insurance Company ("Commercial Union") is the workmen's compensation carrier for Joe Corona's employer. Commercial Union has paid $162,039.94 in benefits to Mr. Corona as a result of this accident.
Magic City filed a declaratory judgment action against the Guaranty Association and the Coronas on February 23, 1988. Magic City sought a declaration that the Guaranty Association was responsible for the benefit of claimants (the Coronas) in the amount of $150,000.00 for primary coverage and $150,000.00 for excess coverage; these figures constitute the full extent of statutory coverage under the Commercial Standard and Integrity policies. The Guaranty Association answered, taking the position that the prior payment of worker's compensation benefits to Joe Corona, which exceeded its $150,000.00 limits, offset its monetary obligation under the Commercial Standard policy and that the Integrity excess coverage policy did not require it to "drop down" and provide primary coverage until the policy limits under the original primary coverage ($1,000,000) had been paid on this claim.
Magic City, further, sought injunctive relief, requesting that the Coronas be enjoined from prosecuting their tort claims until this action had been adjudicated. An injunction was granted, which has since expired.
The matter was submitted to the trial court on briefs and joint stipulation of facts to determine these issues: (1) whether the Alabama Insurance Guaranty Association Act (Code 1975, §§ 27-42-1 et seq.) permits the Guaranty Association to reduce its obligation on the primary policy (issued by Commercial Standard) by the amount of workmen's compensation benefits paid to the claimant and (2) whether under the language of the Integrity excess liability policy the Guaranty Association is required to "drop down" and provide primary coverage to Magic City. The trial court issued a final judgment on June 24, 1988, which held:
"ONE: The Guaranty Association has no greater obligation under the Integrity policy than Integrity would have had, if it had remained solvent.
"TWO: Although an employer's obligations under the Workmen's Compensation statutes are often insured, workmen's compensation benefits are not insurance benefits, and thus, the Guaranty Association is not entitled to reduce its obligation to a policy holder or claimant by the amount paid to such person as workmen's compensation benefits.
"THREE: The language of the excess policy issued by Integrity does not require it to drop down and provide primary coverage to Magic City due to the insolvency of the primary insurance carrier."
*851 The Guaranty Association, on August 2, 1988, appealed that portion of the court's order holding that the Guaranty Association was not entitled to reduce its obligation under the Commercial Standard policy by the workmen's compensation payments to Mr. Corona. Magic City cross-appealed on August 10, 1988. Joe and Mary Corona cross-appealed on August 15, 1988.

I.
We first address the question of whether the trial court erred in holding that the workmen's compensation benefits paid to Joe Corona were not insurance benefits and thus precluding the Guaranty Association from reducing its obligations under the Commercial Standard policy. In ruling that the Guaranty Association could not reduce its statutory obligation by the amount of workmen's compensation paid to Joe Corona, the trial court stated:
"The Alabama Workmen's Compensation Act is found in Section 25-5-1 et seq., Code of Alabama 1975. While it is perhaps common to equate `workmen's compensation benefits' with workmen's compensation insurance, the two phrases are not synonymous and, in fact, employers are given an option under Section 25-5-8 to secure the obligation of the payment of compensation either by insuring the risks or by proof of financial ability to pay such compensation directly as the obligations arise. It is, therefore, the opinion of the court that workmen's compensation benefits which are paid to a policy holder or claimant do not fall within the provisions of Section 27-42-12 which reduce the amount payable by the Guaranty Association when recovery is made under an insurance policy." (R. 89)
The Guaranty Association is a nonprofit organization created by the Alabama Insurance Guaranty Association Act (the "Act"). Code 1975, § 27-42-1 et seq. Many states have passed laws creating such insurance guaranty associations, and although the state acts differ somewhat, they tend to have the same basic concepts. Annot., 30 A.L.R. 4th 1110, 1114 (1984). The Guaranty Association is funded by its members and handles claims of policyholders or claimants who are residents of Alabama involving insurance carriers licensed to transact business in Alabama. Code 1975, § 27-42-5. The Act is applicable to all kinds of direct insurance, "except life, annuities, disability, accident and health, title, surety, credit mortgage guaranty and ocean marine insurance." Code 1975, § 27-42-3.
Covered claims are defined by the Act as follows:
"(4) COVERED CLAIM. An unpaid claim, including one of unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer after January 1, 1981 and (i) the claimant or insured is a resident of this state at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this state. `Covered claim' shall not include any amount due any reinsurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise."
Code 1975, § 27-42-5(4).
The Act also provides for non-duplication of recovery, in § 27-42-12, which in pertinent part states:
"(a) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his rights under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy."
We must determine whether the workmen's compensation payments to Joe Corona fall within the exception of § 27-42-3 so as not to be subject to the non-duplication provisions of § 27-42-12.
The Supreme Court of Louisiana addressed this question in Senac v. Sandefer, 418 So.2d 543 (La.1982). Louisiana has a non-duplication statute almost identical to § 27-42-12 (the only difference being the *852 use of the word "part" where Alabama uses the word "chapter"). The plaintiff, Senac, was injured in an automobile accident while operating his employer's delivery truck. He sued the other driver for damages based on medical expenses, pain and suffering, and loss of wages. The defendant's insurer was declared insolvent and its obligations were assumed by the Louisiana Insurance Guaranty Association. A stipulation was entered into by the parties as to general damages. The question before the Louisiana Supreme Court was whether the Guaranty Association was entitled to offset the stipulated general damages due to plaintiff by the amount paid to him in workmen's compensation benefits.
The Louisiana court reasoned that workmen's compensation is social legislation passed for the joint benefit of labor and management:
"In order that this end might be accomplished, the Legislature provided for sacrifices to be made by both the employer and the employee. The employee was required to waive the right granted him under the general law, Article 2315 of the Civil Code, in consideration of receiving a fixed percentage of his wages during the period of his disability. The employer, on the other hand, was deprived of the defenses afforded to him by the general law and he was assured that, in case any of his employees were injured, they would be entitled to no more than the amount stipulated in the statute as compensation during the period of disability."
418 So.2d at 545, quoting Atchison v. May, 201 La. 1003, 10 So.2d 785 at 788 (1942). However, the same quid pro quo arrangement is not present in the relationship between the injured worker and a third-party tort-feasor. The court held that the Guaranty Association was not entitled to an offset for workmen's compensation benefits paid to the plaintiff. 418 So.2d at 546.
In Alabama Insurance Guaranty Ass'n v. Stephenson, 514 So.2d 1000 (Ala.1987), this Court addressed the question of whether the Guaranty Association was entitled to an offset due to an injured party's receipt of benefits under her own employee health plan. We held that the plan of health insurance administered by Blue Cross is a kind of direct insurance excepted by the provisions of § 27-42-3 and, thus, that benefits paid thereunder do not fall within the provisions of the Act, in particular the nonduplication section, § 27-42-12. 514 So.2d at 1002. We followed the reasoning of the Pennsylvania superior court in Bullock v. Pariser, 311 Pa.Super. 487, 457 A.2d 1287 (1983), in which the plaintiff had received a payment from her own disability insurance carrier following an injury. The Pennsylvania Insurance Guaranty Association undertook to defend the action that had been filed by the plaintiff and maintained that it was entitled to an offset for the sum paid to the plaintiff by her own disability carrier. 311 Pa.Super. at 490, 457 A.2d at 1290. The Pennsylvania statutory provision is almost identical to its corresponding Alabama provision. See Alabama Insurance Guaranty Ass'n v. Stephenson, 514 So.2d at 1002, n. 2. The Pennsylvania superior court held that the plaintiff's recovery from her disability insurer was not a "covered claim" because it did not result from the insolvency of any insurer. See the discussion of Bullock at 514 So.2d at 1002-03. The court also stated that the purpose of the Act is to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer. The non-duplication provision functions to prevent windfall judgments so that a claimant does not obtain a greater recovery than he would have received had the tort-feasor's insurance company remained solvent. The Pennsylvania court noted that the plaintiff in Bullock was placed in no better position than she would have been in if the insurance company had remained solvent. Similarly, we found Stephenson's receipt of benefits to place her in no better position than she would have been in if the insurance company had remained solvent. 514 So.2d at 1003.
In the case before us, Joe Corona's receipt of worker's compensation benefits places him in no better position than he would have been in had Magic City's insuring *853 companies remained solvent. There is no windfall situation here.
Workmen's compensation benefits, which paid for Joe Corona's medical expenses, are excluded from the definition of "covered claims" found in § 27-42-5(4), and, as was stated by the trial judge, are not "insurance benefits" available to the Guaranty Association to offset against the claim. Joe Corona was injured in the course of his employment. Had he not been injured on the job, he would have been in the identical position as the accident victim in Stephenson. Workmen's compensation provided medical benefits to him due to the accident, not due to the insolvency of the tort-feasor's insurer. There is no duplication for which the Guaranty Association would be due a set-off.
The Guaranty Association relies on the case of Ferrari v. Toto, 9 Mass.App. 483, 402 N.E.2d 107 (1980), aff'd, 383 Mass. 36, 417 N.E.2d 427 (1981), in which the Massachusetts Insurers Insolvency Fund ("the Fund") was excused from paying Ferrari's claim due to his receipt of workmen's compensation benefits. However, close examination of that case shows that the Fund was held not to have to pay what amounted to a subrogation claim of the insurer that had provided Ferrari with workmen's compensation benefits. The court noted: "We are of the opinion that the Fund is excused from paying claims if the ultimate beneficiary is an insurance company." 9 Mass. App. at 486, 402 N.E.2d at 109. Alabama law is in agreement: Section 27-42-5(4) expressly states: "`Covered claim' shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise." There is no subrogation in the instant case, as the workmen's compensation carrier has waived any subrogation claims it might have.
Other cases cited by the Guaranty Association in which a guaranty fund or association has been allowed a set-off involve uninsured motorist claims that have been recovered under the claimant's own insurance policy's uninsured motorist provision because of the insolvency of the other driver's insurer. In these cases the uninsured motorist payments were made solely as a result of the insolvency of the claimant's insurer. Therefore they were "covered claims" and deductible. There would have been duplication in these cases, and thus a set-off was allowed. See: Arizona Property & Casualty Ins. Fund v. Ueki, 150 Ariz. 451, 724 P.2d 70 (1986); Vokey v. Massachusetts Insurers Insolvency Fund, 381 Mass. 386, 409 N.E.2d 783 (1980); and Lucas v. Illinois Ins. Guaranty Fund, 52 Ill.App.3d 237, 10 Ill.Dec. 81, 367 N.E.2d 469 (1977).
We hold that the Alabama Insurance Guaranty Association is not entitled to reduce its obligation to a policyholder or claimant by the amount paid to that person as workmen's compensation benefits, and we affirm the trial court's ruling in this regard.

II.
The second question presented to this Court is whether the trial court erred in holding that under the language of the Integrity excess liability policy the Guaranty Association is not required to "drop down" and provide primary coverage to Magic City due to the insolvency of Commercial Standard.
The Guaranty Association's liability to Magic City under the Integrity policy is the same as Integrity would face but for its insolvency. Code 1975, § 27-42-8(a)(2), provides that the Guaranty Association shall "(2) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." The Guaranty Association may raise the same policy defenses that would have been available to Integrity. Code 1975, § 27-42-8(a), (b).
Therefore, we look to the language of the Integrity "commercial catastrophe liability" policy. Section two, "Underlying Limit-Retained Limit," states:
"The Company shall be liable only for the ultimate net loss the excess of the *854 greater of the insured's underlying limit or retained limit defined as:
"(a) Underlying limitan amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the insured; ..." [Emphasis added.] Policy ProvisionsPart 2Form ISX-1000. (Supp.R. 32).
Section three, "Limits of Liability," states:
"Regardless of the number of persons and organizations who are insured under this policy and regardless of the number of claims made and suits brought against any or all insureds, the total limit of the Company's liability for ultimate net loss resulting from any one occurrence shall not exceed the amount specified in item 3(a) of the declarations.
"The Company's liability shall be further limited to the amount stated as the annual aggregate limit in item 3(b) of the declarations on account of all occurrences during each policy year arising out of either the products hazard or completed operations hazard or both combined.
"In the event that the aggregate limits of liability of the underlying policies listed in the schedule of underlying insurance, are exhausted or reduced, solely as the result of occurrences taking place after the inception date of this policy, this policy shall, subject to the Company's limit of liability and to the other terms of this policy, with respect to occurrences which take place during the period of this policy, continue in force as underlying insurance for the remainder of the policy year of the underlying policy or until the Company's aggregate limit of liability (stated in Item 3(b)) is exhausted, but not for broader coverage than was provided by the exhausted underlying insurance...." Policy ProvisionsPart 2Form ISX-1000. (Supp.R. 32).
In holding that the language of the Integrity policy did not require it to "drop down," the trial court reasoned:
"It is the opinion of the Court that the underlying limit as set out in the policy breaks down as follows:
"`An amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance.'
"which in this case is $1,000.000.00
"`plus the applicable limits of any other underlying insurance collectible by the insured.'
"which in this case is zero because there is no other underlying insurance collectible by the insured. Thus, the Court finds that, by its terms, the Integrity policy only covers cases in excess of $1,000,000.00." (R. 90.)
We disagree with the decision of the trial court. The Integrity policy does not explicitly confront the consequences of the insolvency of the underlying insurer. The language in Integrity "Limits of Liability" provision does not put Magic City on notice that it purports to address consequences flowing from the insolvency of Magic City's primary insurer.
The phrase "collectible by the insured" in Integrity's policy means that Integrity will provide coverage where the primary coverage is not collectible. If there is no collectible underlying coverage, then the excess coverage "drops down" to fill the gap.
Courts look to the language of the policy to determine whether the insurer must drop down and provide coverage in cases of insolvency of the primary insurer. When an excess insurer, such as Integrity in this case, uses the term "collectible" or similar language in its underlying limit provision, courts have held that the insurer agrees to drop down in the event of the insolvency of the primary insurer:
"When an excess insurer uses the term `collectible' or `recoverable' it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term `covered' or `not covered' it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage *855 for the occurrence or the occurrences in question."
Mission National Insurance Co. v. Duke Transportation Co., 792 F.2d 550, 553 (5th Cir.1986). See: Poirrier v. Cajun Insulation, Inc., 501 So.2d 800, 807 (La.App. 1986), cert. denied, 503 So.2d 471 (La.1987); American Lumbermen's Mutual Casualty Co. v. Lumber Mutual Casualty Insurance Co., 251 A.D. 231, 235, 295 N.Y.S. 321, 324-25 (1937); Gladstone v. D. W. Ritter Co., 133 Misc.2d 922, 508 N.Y.S.2d 880, 883 (Sup.Ct.1986); Geerdes v. St. Paul Fire & Marine Insurance Co., 128 Mich. App. 730, 341 N.W.2d 195 (1983); Insurance Insolvency Fund v. Continental Casualty Co., 399 Mass. 598, 600-01, 506 N.E.2d 118, 120-21 (1987); Donald B. MacNeal, Inc. v. Interstate Fire & Casualty Co., 132 Ill.App.3d 564, 567-68, 87 Ill.Dec. 794, 477 N.E.2d 1322, 1325-26 (1985); Gros v. Houston Fire & Casualty Insurance Co., 195 So.2d 674, 676 (La.App.1967), writ refused, 250 La. 644, 197 So.2d 898 (1967); Beauregard v. Salmon, 211 So.2d 732 (La. App.1968), writ refused, 252 La. 883, 214 So.2d 550 (1968); Reserve Insurance Co. v. Pisciotta, 30 Cal.3d 800, 815, 180 Cal.Rptr. 628, 640 P.2d 764 (1982). Other courts have relied upon limits of liability provisions to hold that the excess insurer is not required to drop down in the event the primary insurer becomes insolvent. United States Fire Insurance Co. v. Capital Ford Truck Sales, 257 Ga. 77, 355 S.E.2d 428, 432-33 (1987); Value City Inc. v. Integrity Insurance Co., 30 Ohio App.3d 274, 277, 508 N.E.2d 184, 187 (1986); Radiator Specialty Co. v. First State Insurance Co., 651 F.Supp. 439, 441 (W.D.N.C.1987), aff'd, 836 F.2d 193 (4th Cir.1987); Zurich Insurance Co. v. Heil Co., 815 F.2d 1122, 1125-26 (7th Cir.1987).
The language of the Integrity policy is ambiguous as to the duty of the excess policy when the primary insurer is insolvent. It is the general rule in Alabama that ambiguities are to be construed liberally in favor of the insured and against the insurer, in order to provide the maximum coverage for the insured. St. Paul Fire & Marine Ins. Co. v. Thompson, 280 Ala. 67, 189 So.2d 866, 869 (1966), Rodgers v. Commercial Casualty Ins. Co., 237 Ala. 301, 303, 186 So. 684 (1939), Mission Insurance Co. v. Barnett, 476 F.Supp. 925 (S.D. Ala.1979), State Farm Mutual Auto. Insurance Co. v. Lewis, 514 So.2d 863, 865 (Ala.1987).
In determining whether excess coverage drops down when the underlying insurance is not collectible, the Supreme Judicial Court of Massachusetts looked to traditional analysis and declared that ambiguity in the policy should be resolved in favor of the insured. Gulezian v. Lincoln Ins. Co., 399 Mass. 606, 506 N.E.2d 123, 125 (1987). In holding that the excess insurer, Lincoln Insurance Company, should drop down due to the insolvency of the primary insurer, Ambassador Insurance Company, the court stated:
"It seems likely that Lincoln did not contemplate the insolvency of a scheduled underlying insurer in drafting its policy. The phenomenon of the insolvency of an insurer is not, however, so rare as to excuse that omission of attention to detail. The result is that Lincoln issued a policy in which it generated uncertainty as to what should happen on the insolvency of a primary insurer. On traditional analysis (see Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146, 439 N.E.2d 234 [1982]), the ambiguity must be construed against Lincoln. The Lincoln indemnity coverage drops down to cover the consequences of Ambassador's insolvency."
399 Mass. at 612, 506 N.E.2d at 126. The same court reasoned in another case decided on the same day:
"In terms of what a reasonable insured might conclude looking at its insurance policy, a matter of hypothetical insured's reasonable expectations, the clearest fact is that the policy does not explicitly confront the consequences of the insolvency of the underlying insurer. An insurance company no doubt would view the amount of the underlying coverage as a kind of deductible amount assumed by the policyholder in all circumstances. On the other hand, if a reasonable policyholder thought about the subject *856 at all, it probably would have assumed that the excess insurer would step into the void whenever, for whatever reason, the primary insurance company could not or would not meet its policy obligations."
Massachusetts Insurers Insolvency Fund v. Continental Casualty Co., 399 Mass. 598, 600, 506 N.E.2d 118, 120 (1987).
In this case Magic City had a reasonable expectation that Integrity would provide it with drop-down excess coverage in the event of the insolvency of the primary insurer. Under our traditional analysis and sound public policy, we reverse that portion of the judgment denying drop-down excess coverage and we hold that, under the language of the excess insurance policy, Integrity is required to drop down and provide primary coverage to Magic City due to the insolvency of the primary insurance carrier.
87-1321 AFFIRMED.
87-1348 REVERSED AND REMANDED.
87-1388 REVERSED AND REMANDED.
HORNSBY, C.J., and JONES and KENNEDY, JJ., concur.
HOUSTON, J., concurs as to part II and concurs in the result as to part I.
HOUSTON, Justice (concurring in part; concurring in the result in part).
I concur as to part II.
I concur in the result as to part I.
The majority opinion states: "Workmen's compensation statutes authorize the employee to proceed against any third party for damages even though he has been awarded compensation by his employer for the same injury." However, the employer or the employer's insurer is reimbursed for compensation (as opposed to medical expenses) paid to the injured employee from the employee's recovery from the third party, under Alabama Code 1975, § 25-5-11(a), less the amount of applicable attorney fees specified in § 25-5-11(e). Therefore, I am persuaded that Alabama Insurance Guaranty would be entitled to an offset of any amount that a workmen's compensation insurer would be reimbursed under § 25-5-11(a). This would be a duplication of payment, or a double recovery. However, being pragmatic, I realize that lump sum settlements of workmen's compensation benefits frequently involve the quid pro quo of the injured employee's agreeing to accept a certain sum as full and complete settlement of compensation from an employer's insurer in consideration of the insurer's waiving its right under § 25-5-11(a) to be reimbursed for the compensation paid from a third party. Therefore, in cases involving settlement and waiver, I cannot hold as a matter of law that an employee who is paid an additional amount by a third party tort-feasor has received a duplication of payment or a double recovery. Therefore, I will not hold, as a matter of law, that Alabama Insurance Guaranty is entitled to an offset of the amount that a workmen's compensation insurer may be reimbursed under § 25-5-11(a) but for the insurer's waiver of such right.