872 A.2d 800 (2005)
377 N.J. Super. 267
Christine THOMSEN, Plaintiff,
v.
Janice D. MERCER-CHARLES, Caring, Inc., Caring House Projects, Inc., Caring Medical Day Services, Inc., Caring Fellowship Center, Inc., and Coastal Support Services, Inc., Defendants.
Alice Brown, as Administrator ad Prosequendum for the Heirs-at-Law of Alice F. Watts, Deceased, and as Administrator of the Estate of Alice F. Watts, Deceased, Plaintiffs,
v.
Janice D. Mercer-charles, Caring, Inc., Caring House Projects, Inc., Caring Medical Day Services, Inc., Caring Fellowship Center, Inc., Coastal Support Services, Inc., Christine D. Thomsen, Irene McMichael, R.C. Maxwell Co., Atlantic City Electric Co., Bell Atlantic-New Jersey, Inc., Defendants, and
Bell Atlantic-NJ, Inc., Third Party Plaintiff,
v.
County of Atlantic, Third Party Defendant, and
Irene McMichael, Third Party Plaintiff,
v.
Philadelphia Indemnities Insurance Company, Reliance Insurance Company and New Jersey Property-Liability Insurance Guaranty Association, Third Party Defendants.
Larry Spell, by his Guardian ad Litem, Patricia Lynch, Plaintiff-Respondent,
v.
Janice D. Mercer, Caring Inc., Caring House Projects, Inc., Caring Medical Day Services, Caring Fellowship Center, Inc., Coastal Support Services, Inc., Christine D. Thomsen, and Irene McMichael, Defendants, and
Irene McMichael, Third Party Plaintiff,
v.
Philadelphia Indemnities Insurance Company and Reliance Insurance Company, Third Party Defendants,
v.
New Jersey Property-Liability Insurance Guarantee Association, Third Party Defendant-Appellant.
Janice Mercer-Charles and Dexter Charles, her husband, Plaintiffs,
v.
Christine D. Thomsen, Defendant,
v.
Bell Atlantic-NJ, Third Party Plaintiff,
v.
County of Atlantic, Third Party Defendant, and
Irene McMichael, Third Party Plaintiff,
v.
Philadelphia Indemnities Insurance Company, Reliance Insurance Company, and New Jersey Property-Liability Insurance Guaranty Association, Third Party Defendants.
Larry Spell, by his Guardian ad litem, Patricia Lynch, Plaintiff,
v.
R.C. Maxwell Co., Atlantic City Electric Company, Bell Atlantic-NJ, Inc., West *801 Jersey Health Systems Paramedics Unit, Galloway Township Volunteer Ambulance Squad West Division, Egg Harbor City Rescue Squad, William B. Kessler Memorial Hospital, Eugene M. Mlynarczyk, M.D., Lisa Rasom, RN, L. DeFrancisco, RN, Defendants,
v.
Bell Atlantic-NJ, Third Party Plaintiff,
v.
County of Atlantic, Third Party Defendant, and
Irene McMichael, Third Party Plaintiff,
v.
Philadelphia Indemnities Insurance Company, Reliance Insurance Company and New Jersey Property-Liability Insurance Guarantee Association, Third Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2004.
Decided April 28, 2005.
*802 Mark M. Tallmadge, New York City, argued the cause for appellant New Jersey Property-Liability Insurance Guaranty Association (Bressler, Amery & Ross, attorneys; Mr. Tallmadge, on the brief).
Mark S. Levy, Philadelphia, PA, argued the cause for respondent Larry Spell (Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, attorneys; Melissa T. Herskowitz and Mr. Levy, on the brief).
Before Judges A.A. RODRÍGUEZ, WEISSBARD and HOENS.
The opinion of the court is delivered by:
RODRÍGUEZ, A.A., P.J.A.D.
This appeal was brought by the New Jersey Property-Liability Insurance Guaranty Association (the Association) concerning interpretation of the exhaustion and setoff provision (N.J.S.A. 17:30A-12b) of the New Jersey Property-Liability Insurance Guaranty Act (the Act).[1] The specific issue presented is whether the Act's setoff provision operates to reduce the amount payable on a covered claim by the amount of coverage available from a solvent insurer, even when the claim far exceeds the coverage limits of the solvent insurer's policy. The setoff provision provides in pertinent part:
[a]ny person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim . . . shall be reduced by the amount of recovery under any such insurance policy.
[N.J.S.A. 17:30A-12b.]
We hold that the Association is entitled to a setoff of the full amount paid by a solvent insurer. In other words, when there is coverage by two policies and the exhaustion of the solvent insurer's policy does not completely recompense the claimant's damages, the Association is still entitled to the setoff. Thus, the Association's obligation is extinguished if the setoff equals or exceeds the $300,000 statutory cap for covered claims.

I
The facts are undisputed. On September 5, 1996, Larry Spell, then thirty-eight years old, was a passenger in a 1994 *803 Dodge para-transit van owned by Caring, Inc. and leased to Caring Medical Day Services, Inc. (collectively "Caring") and operated by Janice Mercer-Charles, an employee of Caring. There was a collision between the van and a vehicle operated by Christine Thomsen. As a result of the impact, the van crashed into a telephone pole. Spell suffered a fractured neck and was rendered a quadriplegic. Alice F. Watts, another passenger in the van, died as a result of the accident. Lawsuits were filed by Spell, the Estate of Watts, Thomsen and Mercer-Charles against various parties.
At the time of the accident, Caring was insured pursuant to a business automobile policy issued by Philadelphia Insurance Company (PIC). The PIC policy provided liability coverage in the amount of $1 million for any one accident. Caring was also insured pursuant to a commercial insurance policy issued by Reliance Insurance Company (Reliance). The Reliance policy provided liability coverage in the amount of $1 million for any one accident.
Spell offered to settle his claims against Mercer-Charles and Caring for $2 million. The offer was eventually accepted by Caring's insurers, PIC and Reliance. A consent order was entered permitting PIC and Reliance to deposit their respective policy limits into court, pending an allocation hearing. PIC deposited its $1 million. However, before Reliance deposited its limit, it was declared insolvent and ordered into liquidation by a Pennsylvania court. As a result, the Association moved successfully to intervene in the litigation and assumed responsibility for claims against Reliance's insured.
The Association moved for a declaration that its $300,000 per claim statutory obligation must be reduced by any amount received from PIC, the solvent insurer. Spell opposed this motion. For purposes of the motion, the parties agreed that Spell's damages exceeded $2 million. In a written opinion, the judge denied the Association's motion, ruling that it is not entitled to any setoff. The judge interpreted the language of the setoff provision to mean that the setoff only applies to insurance proceeds payable as a direct result of insolvency.

II
The Association appeals contending that pursuant to the setoff provision, its obligation to pay statutory benefits to Spell is reduced to zero. We agree.
We begin our analysis by restating certain core principles of the Act's legislative scheme. First, the Association is not an insurer. It is a private, non-profit, unincorporated legal entity. N.J.S.A. 17:30A-6; Am. Employers' Ins. Co. v. Elf Atochem N. Am., Inc., 157 N.J. 580, 586-87, 725 A.2d 1093, 1096-97 (1999). It depends upon revenue received through statutory assessments levied upon its members, who are insurers writing defined types of direct insurance. Johnson v. Braddy, 376 N.J.Super. 215, 218, 869 A.2d 964 (App.Div.2005); Harrow Stores, Inc. v. Hanover Ins. Co., 315 N.J.Super. 547, 719 A.2d 196 (App.Div.1998). Those assessments are ultimately recouped through policy surcharges imposed upon policyholders, who hold policies embraced within the scope of the Act. N.J.S.A. 17:30A-8a(3); N.J.A.C. 11:1-6.3. The statutory mandate requires the Association to administer and pay "covered claims" that are asserted against insolvent insurers and their policyholders. The Association's purpose is "to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, [and] to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . ." N.J.S.A. *804 17:30A-2a. The Act is to be construed liberally to effect its purposes. Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 516-17, 800 A.2d 54, 61-62 (2002) (citing Am. Employers' Ins. Co., supra, 157 N.J. at 590, 725 A.2d at 1098-99 and N.J. Guar. Ass'n. on Behalf of the Midland Ins. Co. v. Ciani, 242 N.J.Super. 164, 169, 576 A.2d 300, 303 (App.Div.1990)). The Legislature sought "to conserve limited Association resources to better assure their availability to serve core purposes." Ibid.
Second, the Legislature created the Association to provide "a measure of relief for policyholders and claimants in the case of insurer insolvency." Ciani, supra, 242 N.J.Super. at 169, 576 A.2d at 303 (emphasis added). It did not intend to "substitute the Association for the defunct insurer so as to prevent all loss to affected parties." Ibid. (emphasis added); see also Carpenter Tech. Corp., supra, 172 N.J. at 515, 800 A.2d at 60-61; Am. Employers' Ins. Co., supra, 157 N.J. at 590, 725 A.2d at 1098-99. In short, the Association is a limited safety net. It was not designed to put a claimant in the same position as if there had been no insolvency.
Third, the Association does not pay an injured party's entire loss. Instead, it pays only those losses qualifying as "covered claims" pursuant to the terms of the Act. See Carpenter Tech. Corp., supra, 172 N.J. at 508-09, 800 A.2d at 56-57. A "covered claim" is defined as an unpaid claim within the purview of a policy issued by an insurer, which became insolvent after January 1, 1974 and: (1) the claimant or insured is a resident of New Jersey at the time of the insured event; or (2) the property from which the claim arises is permanently located in New Jersey. N.J.S.A. 17:30A-5d. Moreover, "`covered claim' shall not include any amount due any . . . insurer . . . as subrogation recoveries or otherwise." Ibid.; Carpenter Tech. Corp., supra, 172 N.J. at 516, 800 A.2d at 61; Primus v. Alfred Sanzari Enter., 372 N.J.Super. 392, 402, 859 A.2d 452, 458 (App.Div.2004). There is a $300,000 statutory ceiling or cap on a covered claim set by N.J.S.A. 17:30A-8a(1). This ceiling applies regardless of whether or not a claimant's policy exceeds that amount. Ibid.
Fourth, where a claim is covered by numerous policies, some issued by solvent insurers and some by insolvent insurers, the Act expressly sets a priority for coverage. N.J.S.A. 17:30A-12b sets the priority of claims between the Association and solvent insurers.[2]Jendrzejewski v. Allstate Ins. Co., 341 N.J.Super. 460, 463, 775 A.2d 583, 584 (App.Div.2001). The purpose of the setoff provision "was to conserve the assets of the [Association's fund] by shielding it from liability for the obligations of insolvent insurers where there is other insurance covering the same claim that is covered by the insolvent insurer's policy." Id. at 464, 775 A.2d at 585. A claimant must first exhaust the solvent insurer's policy limits. N.J.S.A. 17:30A-12b. The covered claim is thus reduced by the amount recovered from a solvent insurer. Ibid. This statutory priority and setoff trumps traditional principles of priority of coverage, such as primary, excess and co-equal. This is so because the Legislature has created a remedy, albeit a limited one, in a situation where claimants previously had little recourse against an insolvent insurer.
*805 Summarizing, based on the language and the intent of the Act, it is clear that the Association was designed to spread the loss incurred by a claimant due to insolvency. It insures that such a claimant receives damages from some source, including the Association, up to a cap or ceiling of $300,000. If the claimant receives from a solvent insurer an amount equal to or greater than $300,000, the Association's obligation to provide statutory benefits is exhausted. Thus, the Association's funds are preserved in order to provide a measure of relief to other potential claimants.

III
Applying those principles here, we conclude that Spell must first exhaust the coverage afforded by the PIC policy. He may then seek recovery from the Association, subject to the $300,000 cap and a setoff in the amount recovered from PIC. See Harrow Stores, Inc., supra, 315 N.J.Super. at 554-55, 719 A.2d at 200-01; Sayre v. Ins. Co. of N. Am., 305 N.J.Super. 209, 215, 701 A.2d 1311, 1314 (App.Div.1997). Thus, here the Association's obligation to Spell is exhausted or reduced to zero by virtue of the setoff provision.
We reject the argument advanced by Spell and accepted by the judge that the setoff provision applies only to insurance proceeds payable as a direct result of the insolvency of a insurer. Other than uninsured motorist coverage, we cannot identify any type of coverage payable directly as a result of the insolvency of a insurer. Moreover, the setoff provision applies in situations where there is "overlapping coverage of a solvent and insolvent insurer during the same period of time." Sayre, supra, 305 N.J.Super. at 214, 701 A.2d at 1314.
We also reject the argument that the setoff should be reduced from the total amount of the claimant's losses, not from the $300,000 "covered claim" ceiling. The express and unambiguous language of the Act mandates that the setoff be deducted from a "covered claim." By definition, a "covered claim" is the amount that the Association is potentially obligated to pay, not the full extent of the damages suffered by the claimant. See Carpenter Tech. Corp., supra, 172 N.J. at 526, 800 A.2d at 67 (holding that a setoff for amounts recoverable from a foreign state's insurance guaranty association should be deducted from any amount recoverable from the Association).
The Law Division judge relied on several cases from other states to support his decision. However, these cases are distinguishable. In Ariz. Prop. & Cas. Ins. Guar. Fund v. Herder, 156 Ariz. 203, 751 P.2d 519 (1988), a passenger was injured when the automobile in which he was traveling was hit by an uninsured motorist. The parties stipulated that the passenger's damages exceeded $30,000. Id. at 520. The passenger was covered by two uninsured motorists (UM) policies, his own and that of his host driver. Ibid. Both policies had $15,000 per person limits. Ibid. The passenger recovered UM benefits in the amount of $15,000 from the host driver's insurance. Ibid. However, his own insurer had become insolvent. Ibid. The passenger sought recovery from APCIGF, Arizona's equivalent of the Association.[3] APCIGF refused payment, arguing that pursuant to A.R.S. § 20-673C (2005), it was required to pay the $15,000 limits of the policy issued by the insolvent insurer, and this was reduced by the amount recovered from the host driver's insurer. Id. at 521. The Supreme Court of Arizona held *806 that the passenger could recover the additional $15,000 from APCIGF. Id. at 524.
Herder dealt with a different situation than the one presented here. The Arizona statute deems a policy issued by an insolvent insurer to be "excess coverage." A.R.S. § 20-673C (2005). New Jersey does not employ such a provision. Thus, in New Jersey, an insolvent insurer's policy is not deemed excess coverage. Rather, the Association's benefits are to be reached only after all solvent insurers' policies are exhausted. This is significantly different than creating a level of excess coverage where none had existed.
The judge also relied on Wash. Ins. Guar. Ass'n v. McKinstry Co., 56 Wash.App. 545, 784 P.2d 190 (1990). The case is factually distinguishable. There, an insured was sued on a negligence claim exceeding $1 million. Id. at 191. The insured's primary insurance carrier tendered its policy limit of $500,000. Ibid. However, the excess carrier became insolvent. Ibid. WIGA, Washington's equivalent of the Association,[4] refused to pay the remaining $500,000, arguing that the amount payable should be reduced by the amount of any recovery under the primary insurer's policy. Ibid. The Court of Appeals of Washington held that WIGA could not offset payments by a primary insurer when it is standing in the shoes of an insolvent excess insurer. Id. at 194. Therefore, McKinstry Co. is distinguishable because it dealt with different types of insurers: primary and excess.
Finally, the judge relied on CD Inv. Co. et al. v. Cal. Ins. Guar. Ass'n, 84 Cal.App.4th 1410, 101 Cal.Rptr.2d 806 (2000). That holding is distinguishable because it concerned policies issued to cover five successive periods. Id. at 1417, 101 Cal.Rptr.2d 806. There, the insureds became insolvent. Ibid. Their obligations were assumed by CIGA, California's equivalent to the Association. Ibid. CIGA denied the claims, arguing that the solvent insurers had already paid $1.5 million, which exceeded CIGA's statutory cap of $500,000. Ibid. The California Court of Appeals held: (1) the statutory cap applies separately to each covered claim; and (2) each policy issued for a specific period of time gives rise to a separate covered claim. Id. at 1429, 101 Cal.Rptr.2d 806. Thus, the CD case is distinguishable because we are not dealing with coverage for separate or successive periods, but with two policies covering the same loss.
Accordingly, the order denying the Association's motion is reversed. The matter is remanded to the Law Division, Atlantic County, for the entry of a judgment declaring that the Association's obligation to pay Spell's covered claim has been eliminated by PIC's payment.
Reversed and remanded.
WEISSBARD, J.A.D., dissenting.
I conclude that where, as here, a person is grievously injured in an accident for which there is liability coverage under two insurance policies, one with a carrier that becomes insolvent, the individual is not precluded by N.J.S.A. 17:30A-12b from recovering the maximum amount available from the New Jersey Property-Liability Guaranty Association (PLIGA) by virtue of having recovered a greater amount from the solvent carrier, where the individual's damages are not satisfied by the amount received from the solvent carrier. Accordingly, I respectfully dissent for the reasons expressed by Judge Perskie in his careful, exhaustive and, in my view, persuasive written opinion which states, in pertinent part, as follows:

*807 The dispute in this matter turns on the meaning to be ascribed to the phrase "an amount payable on a covered claim . . . shall be reduced by the amount of recovery" in Section 12(b). As Plaintiffs interpret this language, and in particular the reference to "covered claim," it means that NJPLIGA is entitled to a credit against its obligation only for those insurance proceeds available to Plaintiffs arising out of and attributable to the insolvency of Reliance. Because the PIC proceeds are available irrespective of Reliance's insolvency and payment from NJPLIGA would therefore not be a "double recovery" or a "windfall," Plaintiffs insist that the offset provision of Section 12(b) has no application to their claim. NJPLIGA, on the other hand, argues that Section 12(b) was designed to protect the Fund by limiting its liability whenever a claimant has recourse to other insurance that applies to the claim, whether or not that other coverage "arises out of" the insolvency of an insurer, and that no payment from the Fund is required if Plaintiffs have available coverage in excess of NJPLIGA's statutory limit of $300,000.
There is no reported opinion in New Jersey that directly addresses the issue here presented. There are, however, two New Jersey decisions that discuss the provisions of Section 12 and a number of decisions in other jurisdictions, dealing with substantively identical statutory language, that provide assistance in interpreting the Act and applying it to the facts of this case.
In Harrow Stores, Inc. v. Hanover Ins. Co., 315 N.J.Super. 547[, 719 A.2d 196] (App.Div.1998), the court dealt with the issue of "Primary" and "secondary" coverages in the context of NJPLIGA's obligations under the Act. In Harrow, the claimant sued both the manufacturer and the distributor of a chair on which she was injured. The products liability insurer for the manufacturer was insolvent and the distributor's solvent insurer provided coverage for the plaintiffs claim. NJPLIGA was standing in the place of the insolvent carrier. Reversing a trial court ruling that had determined that NJPLIGA's obligations and those of the solvent insurer were "both primary," the Appellate Division observed that "the evident purpose of that provision [Section 12(b)] was to conserve the assets of the Property Liability Insurance Guaranty Fund by shielding it from liability for the obligations of insolvent insurers where there is other insurance covering the same claim that is covered by the insolvent insurer's policy." Harrow, supra, 315 N.J.Super. at 554[, 719 A.2d at 199]. The court held that "where the same covered claim is covered both by a solvent insurer's policy and an insolvent insurer's policy, the insolvent insurer's policy, irrespective of any `other insurance' clause in the policy, cannot be resorted to by the claimant until the policy limits under the solvent insurer's policy are exhausted. Therefore, until such exhaustion, the Association, as the `deemed' insurer under the insolvent insurer's policy, has no obligation." Id. at 555[, 719 A.2d at 200]. The Harrow court did not reach the issue here presented, however, because in Harrow the value of the claim did not exceed the coverage limits available from the solvent insurer. There was, therefore, no opportunity in that case to evaluate NJPLIGA's responsibility for any payments after the solvent insurer's policy limits were exceeded.

Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504[, 800 A.2d 54] (2002), involved claims for environmental cleanup in which NJPLIGA and its Pennsylvania counterpart were both appearing *808 on behalf of several insurers that were insolvent. The Pennsylvania fund was primarily liable (the claimant was a corporate resident of Pennsylvania), and the claimant settled each covered claim with the Pennsylvania Fund for less than the maximum amount$299,900 than the Pennsylvania Fund was authorized to pay under the Pennsylvania version of the Act. The issue before the Supreme Court was the amount of the credit to which NJPLIGA was entitled, under Section 12(a), by reason of the payments from the Pennsylvania Fund. The trial court had concluded that NJPLIGA was entitled to a credit for each covered claim of $299,900. The Appellate Division had rejected that conclusion, holding that NJPLIGA was entitled only to a credit for the amount that the Pennsylvania fund actually paid to the claimant in settlement of each covered claim. The Supreme Court concluded that the Appellate Division's holding contravened the Legislature's intent in creating NJPLIGA and reinstated the trial court's ruling.
While the Carpenter case dealt solely with Section 12(a) of the Act and not with Section 12(b), and the issue presented in the motion before me was not implicated or discussed in that decision, the analysis of the statute undertaken by the Supreme Court is instructive. The Court first determined that the specific language of Section 12(a) was ambiguous, and therefore that "because different interpretations of the statute are arguable, we are obligated to look beyond its language, to discover the `spirit of the law.'" Carpenter, supra, 172 N.J. at 514[, 800 A.2d at 60]. Noting that the language of the Act had been adopted by states throughout the country in an attempt to establish a nationwide network of individual insurance guaranty association statutes designed to spread equitably the risk of insurer insolvency among the states, the Court concluded that the network "should result in [an] as equitable as possible allocation of the inevitable loss where `everyone makes some concessions to the common necessity and no one suffers too much.'" Id. at 515[, 800 A.2d at 60]. The Court went on to observe:
The Legislature did not give NJPLIGA unfettered discretion to accommodate all claimants for any claims. The conservation of resources is a major goal. The Legislature signaled the need for restraint and caution in the payment of claims, and did so in a myriad of ways. Illustratively, NJPLIGA does not pay prejudgment interest on covered claims. N.J.S.A. 17:30A-5d. It is not liable for counsel fees incurred by a successful party in a declaratory judgment coverage action against NJPLIGA. N.J.S.A. 17:30A-5d; New Jersey Guar. Assn. v. Ciani, 242 N.J.Super. 164, 169[, 576 A.2d 300, 303] (App.Div.1990). The Act specifically excludes insurer subrogation claims from the definition of a covered claim. N.J.S.A. 17:30A-5d. Recovery against NJPLIGA is limited to unpaid claims that are either asserted by insureds or claimants who are residents of the State, or concern property permanently located in New Jersey. N.J.S.A. 17:30A-5. NJPLIGA is not responsible for "assessments or charges for failure of [the] insolvent insurer to have expeditiously settled claims." N.J.S.A. 17:30A-5d. Further, where a claim is covered both by a solvent insurer's policy and an insolvent insurer's policy, a policyholder first must exhaust his or her policy with the solvent insurer before NJPLIGA has any statutory obligation to pay the. policyholder.

*809 "Therefore, until such exhaustion[,] [NJPLIGA], as the `deemed' insurer under the insolvent insurer's policy, has no obligation." N.J.S.A. 17:30A-12b; Harrow Stores, Inc. v. Hanover Ins. Co., 315 N.J.Super. 547, 555[, 719 A.2d 196, 200] (App.Div.1998). Finally, the Act's limitation of recovery at $300,000 per covered claim applies regardless of whether a claimant's policy limit exceeds that amount. N.J.S.A. 17:30A-8a(l).

Id. at 515-6[, 800 A.2d at 61] (emphasis added)
Although the scope of relief under the Act is to be construed liberally to effect its purposes, clearly one concern of the Legislature is "to conserve limited Association resources to better assure their availability to serve core purposes." Id. at 516-7[, 800 A.2d at 61], citing American Employers' Ins. Co. v. Elf Atochem North America, Inc., 157 N.J. 580, 590[, 725 A.2d 1093, 1099] (1999) and New Jersey Guar. Ass'n. v. Ciani, 242 N.J.Super. 164, 169[, 576 A.2d at 303] (App.Div.1990). As noted, Carpenter is not controlling here, both because it did not deal with the specific statutory provision that is applicable to this case and because the facts of the two cases are not analogous or even similar. However, Sections 12(a) and 12(b) are parallel in their respective provisions that require that NJPLIGA's liability be "reduced by the amount of recovery" from other specified sources, and Carpenter's emphasis on the "conservation of resources" as a "major goal" of the Act and the "need for restraint and caution in the payment of claims" provides a relevant analytic frame of reference to an examination of cases from other jurisdictions that deal more directly with the issue to be determined here.
Plaintiffs refer the court to several decisions of the Pennsylvania Superior Court. In Sands v. Pennsylvania Ins. Guar. Ass'n., 283 Pa.Super. 217, 423 A.2d 1224 (1980), a passenger was injured in a two-car accident. The passenger's driver was insured and the other driver was not. The passenger recovered his medical expenses and then settled an uninsured motorist claim with the driver's carrier for $10,000. He then claimed against his own carrier, under uninsured motorist coverage, for an additional $10,000. The total claim exceeded $26,000. The passenger's insurer was insolvent and the Pennsylvania equivalent of NJPLIGA refused payment. The court held that the passenger was required to credit the Pennsylvania Fund not with the sum that he could have received from the driver's carrier, but rather only the amount that he actually did receive. The court reasoned that any additional sums theoretically recoverable against the driver were dependent upon a showing of the driver's fault, and that had never been established. This conclusion is inconsistent with the rationale, although not of course the actual holding of our Supreme Court in Carpenter, supra, which limited NJPLIGA's liability by crediting it with the maximum amount recoverable from the Pennsylvania Fund rather than the amounts received by the claimants through a negotiated settlement. Of more immediate relevance to the issue at bar, however, is the fact that the Sands court also rejected the Fund's argument that the passenger's recovery from other sources of more than the Fund's maximum exposure of $9,900 for each covered claim eliminated any liability of the Fund. The court reasoned that the amount recovered by the passenger under the driver's uninsured motorist coverage did not constitute a *810 "covered claim" because it did not result from the insolvency of an insurer, and therefore did not create the possibility of the duplication of recovery that 40 P.S. § 1701.503(a) ("Sec. 503(a)"), Pennsylvania's equivalent of Section 12(b), was designed to prevent. Sands, supra, 283 Pa.Super. at 225, 423 A.2d at 1227-8.
In Bullock v. Pariser, 311 Pa.Super. 487, 457 A.2d 1287 (1983), the claimant was bitten by a dog at a commercial property. The business had liability insurance of $10,000 for each claim but the insurer was insolvent. The court rejected the Fund's position that the disability benefits that the claimant had received from her own insurer should be credited against the Fund's obligation under Section 503(a), applying the same theory that the Sands court had used in defining a "covered claim." Bullock supra, 311 Pa.Super. at 494, 457 A.2d at 1290. Together, then, Sands and Bullock stand for the proposition that sums otherwise received by a claimant regardless of the insolvency of an insurer are not to be credited against the liability of the Pennsylvania Fund pursuant to Section 503(a).

Blackwell v. Pennsylvania Ins. Guar. Ass'n., 390 Pa.Super. 31, 567 A.2d 1103 (1989) involved a passenger injured in a two-vehicle accident. The other driver's insurance carrier was insolvent and thus, under Pennsylvania law, the other driver was deemed "uninsured" by reason of the insolvency. Id. at 33, 567 A.2d at 1104. The claimant recovered $40,000 from her driver's uninsured motorist coverage and $25,000 from her own uninsured motorist coverage. Her total claim was in excess of $365,000. The court held that Section 503(a) required the claimant to credit the Fund with the $65,000 that she had received, limiting the Fund's exposure on her claim to $234,900 because the $65,000 had been "received by the claimant due to the insolvency of an insurer." Id. at 35, 567 A.2d at 1105. Significantly, the court stated:
We recognize that the Sands decision clearly stands for the proposition that a claimant will never be placed in a better position by virtue of the existence of PIGA, than he would have been in had the insurance company not become insolvent. However, it is equally clear that the Legislature did not intend, in enacting the Insurance Guaranty Act, that in all cases a claimant would be placed in the same position he would have been in had the insurance company remained solvent. Even with the existence of PIGA, it was anticipated by the Legislature that some claimants would suffer some amount of financial loss due to the insolvency of an insurer, because PIGA's obligation to a claimant is limited to $300,000 less the $100 deductible.

Blackwell, supra, 390 Pa.Super. at 37, 567 A.2d at 1106 (emphasis in original)
From these Pennsylvania decisions, Plaintiffs extract the principle that Section 12(b) requires a credit against NJPLIGA's obligation only for those sums recoverable by Plaintiffs as a result of the insolvency of an insurer. Because the amounts recoverable by Plaintiffs from PIC would be payable irrespective of Reliance's insolvency status, and because the total value of the claims exceeds the combined liability of PIC and NJPLIGA, Plaintiffs argue that there is no possibility of a "double recovery" or a "windfall" and that, subject to the exhaustion of the other available insurance proceeds, NJPLIGA should not be entitled to any credit, under Section 12(b), against any remaining *811 balance of the claims for the amounts that Plaintiffs will receive from PIC.
Several cases from other jurisdictions support Plaintiffs' argument. In Arizona Prop. & Cas. Ins. Guar. Fund v. Herder, 156 Ariz. 203, 751 P.2d 519 (1988), a decision cited by our Supreme Court in Carpenter, supra, 172 N.J. at [514, 800 A.2d at 60], as illustrative of the "ambiguity" of Section 12(b), the claimant was a passenger who was injured in a collision with an uninsured driver. His damages exceeded $30,000. The claimant recovered $15,000 from his driver's uninsured motorist coverage but his own insurer became insolvent. When the claimant sought recovery from Arizona's equivalent of NJPLIGA for the $15,000 that he would have received from his own insurer, the Arizona Fund refused payment pursuant to the Arizona equivalent of Section 12(b). The Arizona Supreme Court ruled that the statute was "intended to reduce an insurer's liability and prevent double recovery by an insured when there is another policy covering the same loss." Herder, supra, 156 Ariz. at 205, 751 P.2d at 521. Following the same rationale as was employed by our Appellate Division in Harrow Stores, Inc. v. Hanover Ins. Co., 315 N.J.Super. 547, 719 A.2d 196 (App.Div.1998), the Arizona court utilized an "other insurance" analysis and ruled that the Fund's liability would be secondary rather than primary. Id. at 207, 751 P.2d at 523. The court determined, however, that the Fund would be liable for that portion of the claim that exceeded the coverage available from the claimant's own insurer, ruling that the statutory reference to "any amount payable on a covered claim shall be reduced" referred only to a reduction in the amount of the damage claim, not to a reduction in the amount payable by the Fund. "This construction furthers the statutory purpose of preventing duplication in damage payments to the claimant and preventing the claimant from attempting to invoke the collateral source rule." Id. at 207-8, 751 P.2d at 523-4.
The Washington Court of Appeals reached a similar conclusion in Washington Ins. Guar. Ass'n. v. McKinstry Co., 56 Wash.App. 545, 784 P.2d 190 (1990). In that case, the insured was sued for negligence in a claim with a value in excess of $1 million. The insured's primary carrier paid the claimant its full policy, in the amount of $500,000. The insured's excess carrier was insolvent. Washington's equivalent of NJPLIGA refused to pay on a claim against it, arguing that the recovery of the $500,000 by the claimant exceeded the $299,900 statutory limit on the Washington Fund's liability. Again, the statutory language was equivalent to Section 12(b). The claimant argued that the statute was designed only to prevent duplicative recovery. The Fund argued, as does NJPLIGA here, that the statute was designed to bar a recovery from the Fund whenever another source of recovery is available which is at least equal to the Fund's limit of obligation. The court ruled that the Fund was liable up to its statutory limit, without any credit for the sums received by the claimant pursuant to the primary coverage. "Thus, the statute provides for a reduction of [the fund's] statutory obligation only where a claimant, has another source of recovery for the claim against the insolvent insurer, not where a claimant has any other source of recovery." Id. at 550, 784 P.2d at 192 (emphasis in original). This rationale, of course, parallels that of Plaintiffs' construction of the results of the Pennsylvania cases above referenced.
*812 In CD Investment Co., et al. v. California Ins. Guar. Assn., 84 Cal.App.4th 1410, 101 Cal.Rptr.2d 806 (2000), the claimant settled litigation against it by agreeing to pay a total of $2,375,000, together with attorneys' fees and costs. Each of three solvent insurers that had provided coverage to the claimant paid $500,000 toward the settlement. Two additional insurers became insolvent and their obligations were assumed by CIGA, California's version of NJPLIGA, whose liability, under California's version of the Act, was limited to $500,000 for each covered claim. CIGA declined payment, arguing, as does NJPLIGA here, that the claimant's receipt, from the solvent insurers, of more than the limit of CIGA's liability released it from any exposure. The Court of Appeal reversed a lower court ruling in favor of CIGA, stating:
In our view, the "other insurance" provision simply ensures that CIGA is the insurer of last resort. If other insurance of a "covered class" is available on a covered claim, CIGA is responsible only for the amount, if any, exceeding that coverage, up to a maximum of $500,000 (citation omitted). But, as the plain language of the statute indicates, the "other insurance" limitation applies separately to each covered claim. Here, CD Investment has a separate covered claim under each of the insolvent insurers' policies, none of which were covered by any other insurance. Given the lack of other insurance, CIGA's $500,000 cap has not been met on any of those claims.
Second, CIGA's contention is flawed because it improperly uses the payments by the solvent insurers to offset (and in this case, eliminate) CIGA's own obligation to make payments on behalf of the insolvent insurers. On this issue, we do not write on a clean slate. The courts of other states, in applying their own insurance guarantee laws, have soundly rejected CIGA's interpretation. And while the language of the "other insurance" provisions may vary slightly from state to state, they are sufficiently similar for our purposes.
CD Investment Co., supra, 84 Cal.App.4th at 1426-27, 101 Cal.Rptr.2d at 815.
As observed in the CD Investment decision, several other courts have reached the same result. See, e.g., Connecticut Ins. Guar. Ass'n. v. Union Carbide Corp., 217 Conn. 371, 388-9, 585 A.2d 1216, 1224-5 (1991) ("to construe [the other insurance provision] to allow CIGA to offset its obligation as guarantor of the insolvent policies by amounts paid by solvent insurers that fall short of satisfying a claim, for indemnification would, seriously undercut the protection that the legislature intended to provide . . . CIGA's proposed interpretation effectively reduces the coverage afforded by the insolvent policies to the extent of coverage available under the solvent policies even though the loss remains partially unsatisfied."), and Devane [DeVane] v. Kennedy, 205 W.Va. 519, 530, 519 S.E.2d 622, 633 (1999) ("once the claimant or insured has exhausted all other sources of solvent insurance which collaterally insure the covered claim or where there exists no other solvent insurance which provides coverage for the covered claim, he/she is entitled to enforce his/her covered claim against the West Virginia Insurance Guaranty Association, to the extent allowed by [the Act]"). See also RI Insurers' Insolvency Fund v. Benoit, 723 A.2d 303, 306-08 (1999); Cimini v. Nevada Ins. Guar. Ass'n., 112 Nev. 442, 915 P.2d 279 *813 (1996); Aztec v. Prop. & Cas. Ins. Guar. Ass'n., 115 N.M. 475, [485], 853 P.2d 726, 731 (1993); Alabama Ins. Guar. v. Magic City Trucking, 547 So.2d 849, 851-3 (1989).
NJPLIGA submits a recent unpublished decision of the Superior Court of Delaware in Marra v. Wilson, (2003 WL 367831, decided February 20, 2003). In this case the claimant was injured in an automobile accident involving a driver insured by Reliance. The damages were stipulated as being in excess of any available insurance coverage. The claimant recovered $100,000 from other insurance coverage. Delaware's statutory structure parallels Section 12(b) and its equivalent of NJPLIGA also has a $300,000 cap on its liability. The Delaware Fund argued that, by reason of the claimant's recovery in excess of the Fund's statutory cap, it was entitled to a credit against its liability to the claimant and should therefore be required to pay only $200,000 on the claim. The claimant's position, similar to Plaintiffs' here, was that the statutory reference to the "reduction" in the "amount payable" referred to a reduction in the amount of the claim that could be asserted against the Fund, not to a reduction in the amount payable by the Fund. The court, however, agreed with the Fund and ruled that the Pennsylvania Superior Court decision in Blackwell v. Pennsylvania Ins. Guar. Ass'n., 390 Pa.Super. 31, 567 A.2d 1103 (1989), was both apposite and persuasive. The Delaware court did not focus on or discuss the "covered claim" issue that Plaintiffs here insist is a distinguishing aspect of the Blackwell decision, and the opinion does not reference or discuss the cases throughout the country that reached the opposite conclusion.
From all of the foregoing, it is apparent that the determination of the issue sub judice implicates significant policy considerations as well as questions of statutory interpretation. The specific language of Section 12(b) has, as noted; been adopted in states throughout the nation, and there is apparently no conclusion in the several courts' review of the language more consistent than the observation of the Arizona Supreme Court in Herder, supra, 156 Ariz. at 207, 751 P.2d at 523, cited by the Nevada Supreme Court in Cimini v. Nevada Ins. Guar. Ass'n., 112 Nev. 442, 915 P.2d 279, 282 (Nev.1996), and noted with approval by our Supreme Court in Carpenter, supra, 172 N.J. at [514, 800 A.2d at 60], that "the last sentence of [Section 12(b)] is neither a model of clarity nor an exemplar of the draftsman's craft."
With the exception of the recent Delaware decision in Marra, supra, all of the reported decisions that have directly addressed the issue at hand have determined that the proper interpretation of Section 12(b) is one that applies the "reduction" to the total amount of the claimant's claim, not to the amounts to be paid by the Fund. I find these cases persuasive, and the results fully consonant with the approach taken by our courts in Carpenter and Harrow. Carpenter established the standard that the statute should be applied so as to "result in [an] as equitable as possible allocation of the inevitable loss where `everyone makes some concessions to the common necessity and no one suffers too much.'" Carpenter, supra, 172 N.J. at 515[, 800 A.2d at 60]. On these facts, interpreting Section 12(b) as Plaintiffs urge will result in no "windfall" or double recovery for Plaintiffs, and NJPLIGA's exposure will be, as required by the Act, limited to the replacement of up to $300,000 for each of the covered claims. This result is consistent with those in both Carpenter and Harrow, where the principles *814 were established that NJPLIGA's exposure is secondary to that of the solvent carriers and to the obligations of a comparable Fund in the state of the residence of the claimant.
Nor is this result precluded by the words of Section 12(b). Acknowledging, as, has been amply observed, the deficiencies in the legislative draftsmanship, the "spirit of the law" behind the words is, in my view, most effectively realized by an interpretation that links the required reduction in NJPLIGA's exposure to the availability of other insurance that "arises out of and is within the coverage" issued by the insolvent insurer. Were it otherwise, a claimant would be artificially disadvantaged by the fortuitous fact that he or she had other available insurance that would, but for the insolvency, be additive to, rather than a replacement of, the coverage provided by the insolvent carrier. There is nothing in the language or legislative history of Section 12(b) that compels this result, and the focus of Carpenter on the "spirit" of a law that was designed to further an allocation of risk that is "as equitable as possible" militates in favor of the position taken by Plaintiffs.
The Blackwell decision upon which the court relied in Marra is, on its facts, not to the contrary. Blackwell v. Pennsylvania Ins. Guar. Ass'n., 390 Pa.Super. 31, 567 A.2d 1103 (1989). Blackwell's result can, and in my view should, be read as turning on the fact that the insurance available to the claimant there was available solely by reason of the insolvency of the insurer.
The statute was designed, in my view, to put a claimant in essentially the same position, no better and no worse, than if there had been no insolvency. Of course, in view of the statute's limit on the liability of the Fund, some claimants with very serious injuries and insufficient other insurance, such as Spell, will not be in the "same" position as if there had been no insolvency, but that policy determination by the Legislature, articulated in N.J.S.A. 17:30A-2(a), reflects a balanced approach to the stated legislative purpose: to "provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers." Harrow Stores, Inc. v. Hanover Ins. Co., 315 N.J.Super. 547, 554[, 719 A.2d 196, 200] (App.Div.1998). In this context, there is no reason to impose solely on claimants such as Plaintiffs the burden of being significantly disadvantaged by the insolvency of an insurer. The burden of the insolvency was intended by the Legislature to be shared, in this case by a claimant who will recover significantly less than he would have without the insolvency, and by NJPLIGA, which will absorb the burden, capped at $300,000, that the statute contemplated that it would incur by reason of the insolvency.
NOTES
[1] N.J.S.A. 17:30A-1 to -20.
[2] N.J.S.A. 17:30A-12a sets priorities for claims against the Association and similar entities in other states.
[3] APCIGF's statutory cap is $100,000. A.R.S. § 20-667B (2005).
[4] WIGA's statutory cap is $300,000. RCWA 48.32.0601(a) (2005).